**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
Northern Division

| | |
|---|---|
| GROUP HOME ON GIBSON ISLAND, LLC, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 1:20-cv-00891-DLB |
| GIBSON ISLAND CORPORATION, | |
| Defendant. | |

**GIBSON ISLAND CORPORATION'S MEMORANDUM**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION.................................................................................................1

FACTS RELEVANT TO SUMMARY JUDGMENT .............................................3

    A.    The Deed Covenants......................................................................3

    B.    Lussi's Secretive Effort to Circumvent the Deed Covenants to
           Establish an Assisted Living Facility at Banbury...............................4

    C.    Lussi's Resistance to GIC's Attempt to Enforce the Deed
           Covenants........................................................................................5

    D.    This Court's Rebuke of Lussi's Rule-Breaking...................................7

    E.    GIC's Evaluation of Plaintiffs' Accommodation Request .................8

           1.    Architectural Committee Review and Approval......................8

           2.    Accommodations Committee Review and
                 Recommendations ....................................................8

    F.    Lussi's Intemperate "Negotiation" Style and Two-Time Rejection
           of GIC's Approval of an Assisted Living Facility at Banbury ..........10

    G.    The Resumption of Litigation.........................................................15

ARGUMENT.....................................................................................................17

I.    GIC DID NOT REFUSE TO MAKE A REASONABLE
    ACCOMMODATION NECESSARY TO AFFORD BANBURY'S
    POTENTIAL RESIDENTS AN EQUAL OPPORTUNITY TO USE AND
    ENJOY A DWELLING.................................................................................17

    A.    Plaintiffs Have Not Established that Their Proposal for Banbury
           Was "Necessary" to Afford Seniors with Disabilities Equal
           Opportunity to Use and Enjoy a Dwelling.......................................17

    B.    Rather than Refusing to Make a Reasonable Accommodation, GIC
           Approved One—Twice. ..................................................................20

II.    GIC DID NOT INTENTIONALLY MAKE UNAVAILABLE OR DENY
    HOUSING BASED ON THE DISABILITIES OF BANBURY'S
    POTENTIAL RESIDENTS. .........................................................................22

    A.    Plaintiffs Rely Exclusively on Circumstantial Evidence....................23

    B.       Plaintiffs Have Not Made a *Prima Facie* Case of Intentional Disability Discrimination. ................................................................24

         1.     Because GIC Twice Approved an Assisted Living Facility at Banbury, It Did Not "Otherwise Make Unavailable or Deny" Housing to Banbury's Potential Residents...................................25

         2.     GIC Did Not Approve a Similar Opportunity for Another Private Home..................................................................................25

III.    GIC DID NOT DISCRIMINATE IN THE TERMS, CONDITIONS, OR PRIVILEGES OF THE SALE OR RENTAL OF BANBURY, OR IN THE PROVISION OF SERVICES OR FACILITIES THERE. ....................................27

IV.    PLAINTIFFS DO NOT HAVE STANDING TO CLAIM, AND IN ANY EVENT HAVE NOT ADEQUATELY ALLEGED OR PROVEN, THAT GIC RETALIATED AGAINST LUSSI FOR EXERCISING FAIR HOUSING RIGHTS BY DEFAMING HIM. ...............................................30

V.    PLAINTIFFS HAVE NOT ALLEGED, MUCH LESS PROVEN, A DISPARATE IMPACT CLAIM. ................................................................32

CONCLUSION...................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Cameron*,
   No. 20-cv-3739, 2021 WL 5280978 (D. Md. Nov. 12, 2021)............................................. 27

*Bd. of Dir. of Cameron Grove Condo., II v. State Comm'n on Human Relations*,
   431 Md. 61 (2013)............................................................................................................ 17

*Bryant Woods Inn, Inc. v. Howard Cnty.*,
   911 F. Supp. 918 (D. Md. 1996)..................................................................................... 34

*Bryant Woods Inn, Inc. v. Howard Cnty., Md.*,
   124 F.3d 597 (4th Cir. 1997)...............................................................................17, 18, 20

*Burlington N. & Santa Fe Ry. Co. v. White*,
   548 U.S. 53 (2006).......................................................................................................... 30

*Bush v. Davis*,
   No. 09-cv-2002, 2009 U.S. Dist. LEXIS 74987 (D. Md. Aug. 24, 2009)........................... 17

*Carlson v. Boston Sci. Corp.*,
   856 F.3d 320 (4th Cir. 2017)........................................................................................... 26

*Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City*,
   685 F.3d 917 (10th Cir. 2012).....................................................................................25, 26

*City of Joliet v. New W., L.P.*,
   825 F.3d 827 (7th Cir. 2016)........................................................................................... 34

*Clark v. 100 Harborview Drive Council of Unit Owners*,
   No. 14-cv-3122, 2016 WL 1159198 (D. Md. Mar. 23, 2016)......................................30, 31

*Corey v. Sec'y U.S. Dep't HUD ex. rel. Walker*,
   719 F.3d 322 (4th Cir. 2013)..........................................................................................24, 29

*Daveri Dev. Grp., LLC v. Vill. of Wheeling*,
   934 F. Supp. 2d 987 (N.D. Ill. 2013)............................................................................... 24

*Davis v. Habitat for Humanity of Bay Cnty., Inc.*,
   558 Fed. App'x 850 (11th Cir. 2014)............................................................................21, 22

*Edwards v. Johnson Cnty. Health Dep't*,
   885 F.2d 1215 (4th Cir. 1989)........................................................................................22, 25

*Ellis v. City of Minneapolis,*
860 F.3d 1106 (8th Cir. 2017) ........................................................................... 33

*Fair Hous. Ctr. of the Greater Palm Beaches, Inc. v. Sonoma Bay Cmty.*
*Homeowners Ass'n, Inc.,*
136 F. Supp. 3d 1364 (S.D. Fla. 2015) .............................................................. 25

*Gamble v. City of Escondido,*
104 F.3d 300 (9th Cir. 1997) .................................................................. 24, 25, 26

*Gavin v. Spring Ridge Conservancy, Inc.,*
934 F.Supp. 685 (D. Md. 1995) ........................................................................ 19

*Geraci v. Union Square Condo. Ass'n,*
891 F.3d 274 (7th Cir. 2018) ............................................................................ 30

*Gerner v. Cnty. of Chesterfield,*
674 F.3d 264 (4th Cir. 2012) ............................................................................ 25

*Glenn v. Wells Fargo Bank, NA,*
No. 15-cv-3058, 2016 WL 3570274 (D. Md. July 1, 2016) ................................... 32, 33, 34

*Grimsley v. Marshalls of MA Inc.,*
284 Fed. App'x 604 (11th Cir. 2008) ................................................................. 16

*Groteboer v. Eyota Econ. Dev. Auth.,*
724 F. Supp. 2d 1018 (D. Minn. 2010) .............................................................. 21

*Growth Horizons, Inc. v. Delaware Cnty.,*
983 F.2d 1277 (3d Cir. 1993) ........................................................................... 28

*Hall v. Greystar Mgmt. Servs., L.P.,*
28 F. Supp. 3d 490 (D. Md. 2014) ............................................................... 30, 31

*Harmony Haus Westlake, LLC v. Parkstone Property Owners' Ass'n, Inc.,*
851 Fed. App'x 461 (5th Cir. 2021) .............................................................. 18, 20

*Hemisphere Bldg. Co., Inc. v. Vill. of Richton Park,*
171 F.3d 437 (7th Cir. 1999) ...................................................................... 19, 21

*Hill v. Lockheed Martin Logistics Mgmt., Inc.,*
314 F.3d 657 (4th Cir. 2003) ............................................................................ 23

*Howard v. HMK Holdings, LLC,*
988 F.3d 1185 (9th Cir. 2021) .......................................................................... 18

*Laing v. Fed. Express Corp.,*
703 F.3d 713 (4th Cir. 2013) ............................................................................ 23

*Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Tp. of Scotch Plains*,
284 F.3d 442 (3d Cir. 2002) ................................................................. 19

*Letke v. Wells Fargo Home Mortg., Inc.*,
No. 12-cv-3799, 2013 WL 6207836 (D. Md. Nov. 27, 2013) ....................... 23, 34

*Logan v. Matveevskii*,
57 F. Supp. 3d 234 (S.D.N.Y. 2014) ....................................................... 19

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ............................................................................. 23, 24

*Means v. City of Dayton*,
111 F. Supp. 2d 969 (S.D. Ohio 2000) .................................................. 19, 20

*Nichols v. Carriage House Condos at Perry Hall Farms, Inc.*,
No. 14-cv-3611, 2015 WL 4393995 (D. Md. July 15, 2015) ......................... 17

*Norman v. Borison*,
192 Md. App. 405 (2010) ...................................................................... 31

*Pate v. Tucker*,
No. 06-cv-936, 2007 WL 9780573 (D. Md. Jan 11, 2007) ......................... 30, 31

*Pinchback v. Armistead Homes, Inc.*,
907 F.2d 1447 (4th Cir. 1990) ............................................................... 23

*Piscatelli v. Van Smith*,
424 Md. 294 (2012) .............................................................................. 32

*Proa v. NRT Mid Atlantic, Inc.*,
618 F. Supp. 2d 447 (D. Md. 2009) ....................................................... 23

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
903 F.3d 415 (4th Cir. 2018) ................................................................ 33, 35

*Roberson v. Graziano*,
No. WDQ-09-3038, 2010 WL 2106466 (D. Md. May 21, 2010), *aff'd* 411
Fed. App'x 583 (4th Cir. 2011) ............................................................ 27

*Schwartz v. City of Treasure Island*,
544 F.3d 1201 (11th Cir. 2008) ............................................................. 20

*Sunrise Dev., Inc. v. Lower Makefield Twp.*,
No. 2:05-cv-02724, 2006 U.S. Dist. LEXIS 4107 (E.D. Penn. Jan 23. 2006) ....... 28

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
576 U.S. 519 (2015) ............................................................................. 32, 33, 35

*Vorcheimer v. Philadelphian Owners Ass'n*,
   903 F.3d 100 (3d Cir. 2018) ............................................................................. 18

*Williams v. Arora Hills*,
   No. 19-cv-3370, 2021 WL 2226199 (D. Md. June 2, 2021) ............................... 31

*Xiangyuan Zhu v. Countrywide Realty Co.*,
   165 F. Supp. 2d 1181 (D. Kan. 2001) ............................................................... 32

*2922 Sherman Ave. Tenants' Ass'n v. D.C.*,
   444 F.3d 673 (D.C. Cir. 2006) .......................................................................... 34

**Statutes**

42 U.S.C. § 3604(f)(1) ...............................................................................*passim*

42 U.S.C. § 3604(f)(2) ...............................................................................*passim*

42 U.S.C. § 3604(f)(3)(B) ..........................................................................*passim*

42 U.S.C. § 3617 ........................................................................................*passim*

## INTRODUCTION

In late 2019 and early 2020, Craig Lussi ("Lussi") and his companies, Plaintiffs Group Home on Gibson Island, LLC ("GHGI") and Assisted Living Well Compassionate Care 2, LLC ("ALW2"), charged ahead with unapproved plans to establish a commercial, for-profit assisted living facility for nine seniors at 1753 Banbury Road ("Banbury") on Gibson Island. These actions were in blatant violation of restrictive covenants ("Deed Covenants") that require all Gibson Island homeowners to obtain prior approval from Defendant Gibson Island Corporation ("GIC") to use their homes as businesses and to make exterior improvements. Lussi's defiance of the Deed Covenants continued a pattern of unrestrained, confrontational behavior that previously earned him a censure from GIC. To Lussi, the rules that apply to everyone else do not apply to him.

On May 28, 2020, this Court rebuked Lussi for his rule breaking. Granting summary judgment to GIC in a consolidated case, No. 1:20-cv-842-RDB, the Court declared that, if GHGI wished to establish a facility at Banbury, it would first have to seek approval from GIC. The Court found no evidence that GIC's attempt to enforce the Deed Covenants discriminated against GHGI based on the disabilities of Banbury's potential residents. Correspondingly, in this case, the Court denied the preliminary injunction GHGI requested on its federal and state Fair Housing Act ("FHA") claims and encouraged a pause in litigation to allow GHGI to make a proposal to GIC.

Plaintiffs submitted their proposal in June 2020. GIC examined the request through an Accommodations Committee, which produced an extensive report, and then designated a Negotiations Committee to attempt to reach an agreement with Lussi and his family. From January through April 2021, GIC pursued an accommodation in earnest. Yet each of the many proposals GIC made was met with rambling invective from Lussi. He repeatedly accused GIC of discrimination, "public conspiracy," and bad faith, and obsessed over irrelevant issues on which he was waging separate battles. Exasperated by Lussi's "negotiation" tactics, GIC made a best and

final offer on March 18 and again on March 26. Each time, GIC expressly *approved* a facility at Banbury on material terms very similar to what the Lussis indicated they would accept. Yet each time, Lussi *refused* the approval. Tellingly, Plaintiffs omit these events from their Amended Complaint. On April 15, after receiving the second refusal—a digressive, 49-page screed—GIC recognized the futility of further attempts to obtain the Lussis' acceptance and ended the process.

Plaintiffs' Amended Complaint, filed on June 30, 2021, keeps the same two-count federal and state FHA claims as the original Complaint, but now alleges disability discrimination based on GIC's purported refusal to authorize the Banbury facility. The central flaw running through Plaintiffs' claims is Lussi's characteristic refusal to take any accountability whatsoever for his own combative conduct—and, in particular, for his two-time, rancorous rejection of GIC's approval of Banbury. Summary judgment is warranted on all claims, and this case should be dismissed.

On Plaintiffs' reasonable accommodation claim under FHA Section 3604(f)(3)(B), GIC's approvals mean that Plaintiffs cannot establish either that their proposal was "necessary"—*i.e.*, that it would have provided more therapeutic benefits to Banbury's potential residents than the robust alternative GIC approved—or that GIC "refused to make" a reasonable accommodation.

On their claim that GIC "made unavailable or denied" housing because of disability under FHA Section 3604(f)(1), Plaintiffs cannot sustain a *prima facie* case of intentional discrimination because GIC did not (1) deny housing to Banbury's prospective residents—they approved it—or (2) permit, around the same time, similar use of a home for individuals without disabilities.

Though nakedly alleging discrimination in "the terms, conditions, or privileges of [the] sale or rental [of Banbury], or in the provision of services or facilities in connection with [Banbury]" under FHA Section 3604(f)(2), Plaintiffs offer no facts that fit this statutory language, recycling their "make unavailable or deny" allegations instead. Moreover, none of the terms of GIC's approval of Banbury were "because of" the disabilities of Banbury's potential residents.

On their claim under FHA Section 3617 that GIC retaliated against Lussi for exercising fair housing rights by defaming him, Plaintiffs—two companies—lack standing because they are alleging harm to Lussi, not themselves. Even if they had standing, they cannot show that the alleged defamation is "adverse action" sufficient to trigger liability, nor have they satisfied the elements of defamation.

Finally, Plaintiffs have alleged the discriminatory application of a facially neutral rule to *themselves* in *this* case, not the neutral application of a rule with a disparate impact on individuals with disabilities as compared to individuals without disabilities. Thus, they have not even alleged a disparate impact claim, much less adduced enough evidence to survive summary judgment.

## FACTS RELEVANT TO SUMMARY JUDGMENT

### A.    The Deed Covenants

Like every lot on Gibson Island, Banbury is encumbered by restrictive covenants that have run with the land for a century. *See* No. 1:20-cv-00842-RDB ("842 ECF"), ECF No. 30 at 3; Statement of Undisputed Facts ("SOF") ¶¶ 1-2. These "Deed Covenants" prohibit homes to be used as businesses without GIC's prior approval. 842 ECF No. 30 at 3; SOF ¶ 3. Before Plaintiffs made their judicially compelled request for approval to operate an assisted living facility at Banbury, *see infra*, GIC had never received or approved a request from a private homeowner to erect, maintain or use their home as a business. 842 ECF No. 30 at 3-4; SOF ¶ 8.

The Deed Covenants also prohibit exterior improvements to Island homes without prior GIC review and approval. 842 ECF No. 30 at 3; SOF ¶ 4. Through its Architectural Review Committee ("ARC"), GIC has consistently enforced this covenant. 842 ECF No. 30 at 3; SOF ¶¶ 5-7. Lussi knows what the covenant requires, having submitted proposals to improve his own home several times, including as recently as 2016. SOF ¶ 9.

**B.    Lussi's Secretive Effort to Circumvent the Deed Covenants to Establish an Assisted Living Facility at Banbury**

Beginning in fall 2019, Lussi made clandestine plans to buy and establish Banbury as a for-profit assisted living facility without obtaining the business use and exterior renovation approvals the Deed Covenants require. He approached and reached agreement with Banbury's owners, Joseph Hennessy and Gwen Franco, to purchase the property for $6 million. SOF ¶¶ 16-18, 24-27. Lussi then pursued converting the property into an assisted living facility. He hired an architectural firm, which drew up plans, and applied to Anne Arundel County for grading and building permits in Hennessy and Franco's names, even though it was his project. SOF ¶¶ 19-23. Lussi's application identified exterior renovations that should have required ARC approval, including constructing accessible ramps with landings and parking, demolishing retaining walls and a concrete deck, removing solar panels, and repairing or replacing existing HVAC and power generator equipment. SOF ¶¶ 4, 20. Lussi personally "held talks with Anne Arundel County" in pursuit of his plans. 842 ECF No. 30 at 5; SOF ¶ 21.

In the same period, Lussi also approached and obtained a proposal for a business loan from Sandy Spring Bank. SOF ¶ 28-30. He then gave the bank, and later an "appraiser," "a budget calculating projected income from rental revenue, and estimated expenses including 'salaries, food, advertising, website maintenance, entertainment, consultants, and uniforms.'" 842 ECF No. 30 at 6. Lussi also "created two for-profit LLCs … (1) [GHGI] to finance and purchase the Property; and (2) [ALW2], to manage the group home's daily affairs." *Id.* at 5.

After submitting an initial building permit application and two revised applications to correct deficiencies, and after engaging in discussions with county employees, Lussi obtained the building permit. SOF ¶ 22. Several days later, GHGI and the Hennessy/Francos executed a contract of sale for the $6 million price. SOF ¶ 24. Sandy Spring Bank later approved the requested loan

for both purchase and construction of Banbury. 842 ECF No. 30 at 6. The sale closed on March 4, 2020. 842 ECF No. 30 at 6; SOF ¶ 25.

As this Court found, Lussi plainly planned to "start[] a business" and "to earn a profit" with a "facility [that] will feature all the usual incidents of a commercial enterprise—it will employ full-time staff, receive catered deliveries, maintain business records, obtain state licensure, and advertise its services." 842 ECF No. 30 at 12.

### C.   Lussi's Resistance to GIC's Attempt to Enforce the Deed Covenants

Despite the fact Plaintiffs intended to operate Banbury as a business, they never applied to GIC for approval of their plans, as the Deed Covenants required. On March 4, 2020, they began construction of the facility. 842 ECF No. 30 at 6. But because of Lussi's efforts to conceal the plans by using the prior owners as a stalking horse, GIC did not learn of Lussi's activities until March 25. 842 ECF No. 30 at 6; SOF ¶ 39. That day, seeking compliance with the Deed Covenants, GIC demanded that Lussi cease construction. 842 ECF No. 30 at 6. To enforce Island rules, Gibson Island's Special Police ("GI Police") tried to prevent Lussi's construction personnel and equipment from entering onto the Island. SOF ¶ 41. These efforts escalated when Lussi, consistent with his long pattern of aggressive conduct, *see infra*, provoked an altercation at the gatehouse and instructed contractors to go to his property in defiance of GI Police directives. *Id.*

On March 26, GIC President Daly wrote to Lussi advising that his efforts to establish and operate a commercial assisted living facility with exterior renovations without GIC approval violated the Deed Covenants. 842 ECF No. 30 at 6; SOF ¶ 43. Nevertheless, Daly indicated GIC's openness to receive and engage in dialog around any proposal that Lussi wished to submit. 842 ECF No. 30 at 6; SOF ¶ 43. Consistent with the FHA's reasonable accommodation process, Daly requested that Lussi produce details of his plans, assuring Lussi that GIC would give full, fair, and prompt consideration to any proposal. 842 ECF No. 30 at 7; SOF ¶ 43.

Lussi never responded and refused to submit any proposal for approval. 842 ECF No. 30 at 7; SOF ¶ 44. Instead, he continued to circumvent security directives to proceed with renovations, including the exterior improvements covered by the Deed Covenants. Whenever GI Police stopped construction personnel and equipment at the gatehouse, Lussi transported them in his own vehicle—and even by boat. 842 ECF No. 30 at 7; SOF ¶¶ 45-46, 48. As part of his defiance, Lussi summoned law enforcement, calling county police and twice enlisting an off-duty Maryland State Police lieutenant to coerce GI Police not to enforce Island rules. SOF ¶ 42.

Along the way, Lussi lied, and instructed his contractors to lie, to GIC personnel and GI Police to advance the project. On March 27, Lussi had a contractor towing a small cement mixer falsely inform GI Police that he was headed to Lussi's personal home, when in fact he was headed to Banbury. SOF ¶ 46. Soon after the contractor was turned away, Lussi left the Island, returned with the contractor, left the Island again, returned driving the truck and mixer himself, and after discussion involving the off-duty MSP lieutenant, was allowed through. *Id.*

Similarly, on April 3, Lussi told Chief Sperry he had purchased a $30,000 Bobcat that he intended to take to his personal residence. SOF ¶ 48. Lussi appeared at the gatehouse with a trailer loaded with a backhoe. *Id.* Instead of going to his personal residence, Lussi went straight to Banbury and had a contractor begin using the backhoe to tear down retaining walls. *Id.* In response to a complaint, GI Police came to the property and instructed Lussi to stop work, as it was past the 6:00 p.m. Island work curfew. *Id.* The following morning, despite the Island's prohibition on exterior work on weekends, Lussi had the backhoe operator resume work. *Id.* A GI Police officer instructed the operator to stop because he was violating Island policy. *Id.* Lussi interceded, claimed the officer was trespassing, and refused to stop. *Id.* Although the operator stopped momentarily, he resumed soon after the officer left and continued work throughout the day. *Id.* By the end of the day, the retaining walls were demolished. *Id.*

Lussi's flagrant, combative flouting of the Deed Covenants was consistent with his well-documented history of inappropriate confrontational behavior. SOF ¶¶ 14-16. On November 23, 2019—months before anyone knew of Lussi's plans for Banbury—GIC adopted a resolution that condemned Lussi for a series of aggressive actions toward seven different individuals, including several women he intimidated; cited a judge's observation that, despite filing for peace orders, Lussi was actually the one who had engaged in "harassment"; and instructed Lussi to "refrain from such conduct in the future directed at any member of the Gibson Island community." SOF ¶ 14.

**D.      This Court's Rebuke of Lussi's Rule-Breaking**

On March 30, 2020, GIC filed an action seeking a declaration to require Lussi to request approval for a business use and exterior renovations, consistent with the Deed Covenants and the reasonable accommodation provision of the FHA. *See* 842 ECF No. 1. Several days later, GHGI filed this action and sought a preliminary injunction. GHGI alleged that GIC was engaging in intentional discrimination based on the disabilities of Banbury's potential residents by attempting to enforce the Deed Covenants. *See* 842 ECF Nos. 1 & 2. The Court consolidated the actions and entertained simultaneous briefing on the motion for summary judgment that GIC filed in its case and GHGI's motion for preliminary injunction in this case. *See* 842 ECF No. 10.

On May 28, 2020, after a lengthy hearing, the Court granted GIC's motion, entered the declaratory judgment GIC requested, and denied GHGI's motion. *See* 842 ECF Nos. 28, 29, 30; ECF No. 18. In granting GIC's motion, the Court found that the Banbury facility was a business under the Deed Covenants, that the Deed Covenants also covered the exterior renovations, and that GHGI had to seek and obtain GIC approval before recommencing construction. 842 ECF No. 30 at 9-13. Further, finding no evidence of discriminatory motive, *id.* at 14-18, the Court not only rejected GHGI's claim that GIC engaged in disability discrimination by attempting to enforce the Deed Covenants, but also called out Lussi for flouting the rules:

The Deed Covenants do not prohibit the establishment of an assisted-living group home for disabled seniors—they simply require providers to request a reasonable accommodation through the established review procedures. ***Instead of following these procedures and granting the Corporation an opportunity to provide an exception to its facially neutral rules, Group Home seeks to bypass these rules entirely and unilaterally proceed with its construction. The Fair Housing Act simply does not provide Group Home and Lussi a "blanket waiver" of facially neutral rules***. *Bryant Woods*, 124 F.3d at 603. Until an accommodation has been requested and denied—and absent any evidence that the Covenants have been applied to Defendants with a discriminatory motive—Group Home has failed to present a genuine issue of material fact suggesting that the Corporation has violated the Fair Housing Act.

*Id.* at 18 (emphasis added); *see also* SOF ¶ 56 & **Ex. 29** at 122 (this Court "cannot … ignore the fact that Mr. Lussi proceeded at his own peril early in the game with respect to many of these steps he took, summarily making the decision not to seek approval from the Corporation"). Plaintiffs did not appeal the Court's decision, accepting it as binding.

###### E. GIC's Evaluation of Plaintiffs' Accommodation Request

In early June 2020, Plaintiffs submitted two applications to GIC—the first on June 5 for approval of exterior renovations, the second on June 10 for approval to operate an assisted living business for nine seniors at Banbury. SOF ¶ 58.

###### 1. *Architectural Committee Review and Approval*

On July 10, consistent with a June 22 memo explaining its findings, SOF ¶ 61, the ARC sent Plaintiffs a letter indicating several deficiencies with their request. SOF ¶¶ 61, 63. On October 15, after Plaintiffs addressed the deficiencies, the ARC issued a memo recommending approval of the request. SOF ¶ 72. On October 29, the Board approved, SOF ¶ 74, and sent Plaintiffs a letter informing them of the approval. SOF ¶ 75.

###### 2. *Accommodations Committee Review and Recommendations*

On June 26, 2020, the GIC Board voted to create a three-person Accommodations Committee to evaluate Lussi's business use proposal, the first request for a business use GIC had

ever received for a private home. SOF ¶¶ 8,62. On July 16, after several exchanges between the parties' attorneys, the Committee was provided access to documents under this Court's Protective Order so as to facilitate their consideration of the proposal. SOF ¶ 64. The parties agreed to meet on August 21, without counsel, to discuss the proposal. SOF ¶ 65.

On August 20, at Lussi's request, counsel for GIC emailed to Lussi's counsel a list of discussion topics for the meeting. SOF ¶ 66. A lengthy Zoom call took place the next day. SOF ¶ 67. In the following weeks, Lussi provided certain documents and information the Committee had requested and toured Banbury with the Committee. SOF ¶ 68.

On December 11, the Committee submitted a detailed, 30-page report and recommendations to the Board. SOF ¶¶ 77-81. The report provided the litigation context for the Committee's work; described the Committee's investigation; set forth fact findings regarding the planned ownership, management, and daily operation of Banbury, as well as the facility's potential impact on Gibson Island's residential land use scheme; and detailed "vague, unverifiable or inconsistent information from the Lussis." SOF ¶ 78. The Committee concluded that "the operation of a Lussi-operated assisted living facility as a business on Gibson Island will impose major administrative and financial burdens on the Corporation," because "based on Mr. Lussi's history of contentious, rule-breaking behavior and the vague, inconsistent or unverifiable representations the Lussis have made related to the Request, we believe that entering an accommodation agreement with the Lussis will lead to frequent, time-consuming, and potentially expensive disputes initiated by Mr. Lussi, potentially including additional litigation." SOF ¶ 79. But the Committee advised that, "[i]f the Board nonetheless believes an accommodation agreement is feasible, any agreement should contain the following recommended provisions, along with adequate guarantees of performance that would not require the Corporation to engage in extensive litigation with its counterparty(ies) to obtain compliance." SOF ¶ 80. The Committee then set forth 19

recommendations for provisions an agreement should include, "consistent with the [FHA]," to "limit the administrative and financial burdens to the Corporation, protect the residential character of the Island, and diminish any impact on the Island's environment and infrastructure." SOF ¶ 81.

Over the next several weeks, which included the winter holidays, GIC's Board met three times to discuss the Committee report. SOF ¶ 82. On January 5, 2021, the Board adopted a resolution that authorized negotiations with Lussi and established a three-person Negotiations Committee. SOF ¶ 83. The resolution recounted Mr. Lussi's history of contentiousness and rule-breaking, as well as the findings of the Accommodations Committee, before concluding that GIC "is nevertheless willing to further engage in the 'interactive process' by exploring the possibility of entering into a negotiated accommodation agreement that would incorporate the recommendations in the Committee's December 11, 2020 report . . . ." SOF ¶ 84. Following passage of the resolution, newly elected GIC President Guy Cecala sent an email to all shareholders informing them of the negotiations, reiterating GIC's commitment to non-discrimination, and attaching a copy of the resolution. SOF ¶ 85.

### F.   Lussi's Intemperate "Negotiation" Style and Two-Time Rejection of GIC's Approval of an Assisted Living Facility at Banbury

The Negotiations Committee got to work promptly. The Committee and the Lussis exchanged emails to set a date for a meeting, identifying the Accommodation Committee's recommendations as a springboard for discussion. SOF ¶ 86. The Committee and the Lussis met for several hours on January 19, 2021. SOF ¶ 87. Lussi followed up with an email the next day. SOF ¶ 88. On January 24, Lussi[1] sent another email. Foreshadowing the blizzard of bullying, digressive communications to come, this email—far from setting the tone for constructive dialog—

---

[1] Although this and the other emails referenced here were signed by Lussi, his wife Jeannette, and their three children, deposition testimony established that Lussi wrote the emails. SOF ¶ 89 n. 1.

aggressively accused GIC of discrimination and even charged a Committee member with endorsing statements that Lussi said violated the FHA (but in fact did not). SOF ¶¶ 89-91.

The next day, the Committee sent the Lussis a draft Memorandum of Understanding ("MOU") containing the proposed, material terms of an accommodation agreement. The terms largely reflected the Accommodations Committee's recommendations. SOF ¶ 92.

Eight days later, on February 2, rather than responding to the Committee, Lussi sent a lengthy, vituperative email directly to GIC President Cecala. SOF ¶ 93. He attached a clean, signed .pdf (not a Word document) of a final accommodation agreement, which ignored the Committee's request to show the changes being made to its proposed MOU. *Id.* In his email, Lussi alleged that every term of the proposed MOU was discriminatory (though agreeing in substance with most of them); re-litigated the matters this Court had already decided about his violation of the Deed Covenants; maintained he had a personal lifetime exemption from seeking approval from the ARC for exterior renovations; explained why Banbury would only follow "lawful" GIC rules— effectively arrogating to himself the authority to determine which rules to follow; repeated his allegations of GIC's purported history of disability discrimination and "public conspiracy" against him; and accused GIC of considering the Banbury proposal in bad faith. *Id.*

Cecala sent Lussi's package to the Negotiations Committee, which, despite Lussi's combative tone, sent a measured response on February 9. SOF ¶ 94. Attaching a revised MOU, the Committee explained that it was accepting several of Lussi's proposed changes, indicated which changes it could not accept, identified areas for further discussion, and implored Lussi to engage in a conventional negotiation by focusing on the terms of an agreement, eliminating irrelevant issues and baseless allegations, and sending back a Word version of any counterproposal showing changes, rather a clean .pdf with a demand for immediate countersignatures. *Id.*

This initial exchange set a pattern for the next six weeks. SOF ¶ 95. GIC would send a proposal, explaining the changes it was accepting and those it could not, and Lussi would respond with long, unfocused diatribes. With these diatribes, Lussi sought to bully GIC into acquiescence with heated accusations of misconduct, and obsessed over irrelevancies, particularly the 1991 "Carson settlement," which provides fee-based access to the Gibson Island Club to GIC shareholders who do not join the Club. SOF ¶¶ 90, 95 & **Ex. 44** ¶ 15.[2] Altogether, this pattern repeated itself numerous times between January 25 and March 9. SOF ¶ 95

Amid these exchanges, the Negotiations Committee proposed, and the Lussis agreed to, a meeting on February 18 to discuss the parties' differences. SOF ¶ 96. The afternoon before the meeting—which was intended to amicably resolve outstanding issues—Lussi sent the Committee another broadside. SOF ¶ 97. Incredibly, Lussi attached a 29-page *questionnaire* seeking a separate, written justification for each provision of the proposed MOU as a pre-condition to the meeting. *Id.* & **Ex. 59** ("[The proposed meeting time] works for a recorded Zoom call . . . subject to the GIC answering the question(s) below and on the attached form.").

The Committee responded the same day, emphasizing that:

> [T]he purpose of our ongoing discussions with you is not to score points and win arguments, but rather to try to *move past* our disagreements, to resolve the issues that separate us, and to avoid further litigation. We remain willing to do so—to relent on our firm position on administrative and financial burdens and to engage in substantive, meaningful discussions to resolve our differences with you. We obviously cannot force you to do the same. We can only ask. So we ask: if you are genuinely interested in opening a group home at 1753 Banbury, please stop trying to unilaterally dictate the terms of an agreement to us and settle old scores; instead, please engage in a respectful, non-accusatory dialog over the issues that separate us.

SOF ¶ 98. The Committee then noted the main points of disagreement to focus the meeting. *Id.*

---

[2] Lussi was expelled from the Gibson Island Club on November 26, 2019 (again, before anyone knew of his plans for Banbury) based on the same misconduct cited in GIC's November 23, 2019 resolution censuring Lussi. SOF ¶¶ 14-15. Lussi has obsessed over the Carson settlement ever since. SOF ¶ 90 & **Ex. 44** ¶ 15.

The Committee's entreaty was unavailing. After the meeting, the pattern of a Committee offer, followed by a sprawling, incendiary reply, continued for the next three weeks. SOF ¶ 99.

On March 18, exasperated that Lussi's tactics had "negotiations … moving backwards not forward to completion of an MOU…," GIC President Cecala sent the Lussis a best and final offer on behalf of the full Board. In the transmittal email, Cecala expressly approved the establishment of an assisted living facility at Banbury: "the Board has decided that it will **approve** your proposed business use of 1753 Banbury upon your acceptance of the attached MOU." SOF ¶ 100. Cecala also identified the few remaining material points of disagreement, which the MOU resolved. *Id.* Cecala concluded: "Upon your execution of the attached MOU without further revision, we will instruct our counsel to work with your counsel to draft an Accommodation Agreement." *Id.*

On March 20, rather than accepting GIC's approval, the Lussis rejected it and Lussi reverted to form. SOF ¶ 101. Again, he responded with a tirade, rehashing the same grievances, recycling the same points about the irrelevant Carson settlement, and introducing a new irrelevant subject, the proposed revisions to the Deed Covenants that GIC was separately considering and that Lussi vigorously opposed. *Id.* & **Ex. 44** ¶¶ 17-18. Lussi's response included another MOU that was layered with references to the Carson settlement and the proposed Deed Covenants revisions and reflected no compromise on the material points of disagreement. SOF ¶ 101.

On March 26, GIC tried again. Cecala sent Lussi an email making clear that GIC was approving the facility based on the MOU sent on March 18 and would not accept additional changes. SOF ¶ 102. After again explaining why the Carson settlement and proposed Deed Covenants revisions were not germane, Cecala noted why each of the few disputed provisions Plaintiffs kept changing were vital to protecting GIC's interests. These provisions were as follows:

- **The Guarantor Provision**, which required guarantees from all entities and individuals who would be associated with Banbury and its operators. (Plaintiffs had initially agreed to include all these entities and individuals until reneging.) GIC needed this provision

13

given Lussi's history of rule-breaking—"to guard against the situation in which an individual breaches or circumvents the agreement but is effectively unaccountable because they are without means and not all of the related entities or individuals have guaranteed the remedies for their non-compliance."

- **The Septic Provisions**, which required annual septic capacity certification and a septic monitoring plan. The provisions were important because of the environmental sensitivity of Gibson Island, a land covenant providing that Banbury's owner may not expand the occupancy capacity of the residence beyond the criteria in the covenant (e.g., five bedrooms), and the proposed increase in occupancy to nine full-time residents (and bedrooms) and one to three staff around the clock.

- **The Dispute Resolution Provision**, which GIC said had to include a notice-and-cure period of less than the 60 days Lussi demanded in order to resolve disputes promptly.

- **The Arbitration Escrow Provision**, which required each party to put $100,000 in escrow prior to any arbitration. The provision was necessary to ensure the winning party would be made whole and to disincentivize both sides from ginning up disputes and racing to expensive arbitration—a serious concern for GIC given that Lussi had forced GIC into costly, time-consuming litigation to enforce the Deed Covenants.

*Id.*; *see also* Am. Compl. ¶ 1 (Plaintiffs' confirmation that "only four substantive restrictions remained under discussion"). Cecala ended the email by repeating that GIC "will approve your proposed business use of 1753 Banbury Road, subject to the execution of a final Accommodations Agreement, if you sign this proposed MOU *without alteration*." SOF ¶ 102 & **Ex. 68**.

Lussi's response was even more vitriolic than his March 20 response. SOF ¶ 103. In a large package sent to GIC on April 5, Lussi not only rejected the approval, but also delivered a rambling, 49-page, single-spaced screed that accused GIC of serial misconduct, largely on matters that had nothing to do with Banbury. *Id.*

On April 15, recognizing the futility of further attempts to obtain the Lussis' agreement, GIC's Board passed a resolution ending discussions. SOF ¶ 104. The resolution explained that Lussi had twice rejected GIC's approval of Banbury; that Lussi's "history of contentiousness, rule-breaking and untrustworthiness … demonstrate that the Lussi family's operation of [Banbury] will impose undue administrative and financial burdens on the Corporation"; and that "the positions

14

and actions taken by the Lussi family during the course of negotiations regarding an MOU …

reinforce [this] conclusion." *Id.* The next day, Cecala sent the Lussis an email attaching the

resolution. SOF ¶ 105. The email summarized the resolution and stated that, without the provisions

in GIC's MOU, "you would never stop spoiling for a fight, and the Corporation would have

inadequate means to recoup the costs it would be required to incur." *Id.*

### G.     The Resumption of Litigation

On June 30, 2021, Plaintiffs filed their Amended Complaint. ECF No. 47. It includes the

same two causes of action as the initial Complaint. One alleges the violation of four different

provisions of the FHA regarding GIC's actions on Banbury: denying or making housing available

because of disability (42 U.S.C. § 3604(f)(1)); discriminating based on disability in the terms,

conditions, or privileges of the sale or rental of housing, or in the provision of facilities or services

of housing (42 U.S.C. § 3604(f)(2)); refusing to make a reasonable accommodation necessary to

afford individuals with disabilities equal housing opportunity (42 U.S.C. § 3604(f)(3)(B)); and

retaliating against the Lussis because they asserted rights to provide housing to individuals with

disabilities (42 U.S.C. § 3617). *Id.* The second count alleges the same violations under Maryland's

fair housing law. Plaintiffs rely on theories of both disparate treatment and disparate impact. *Id.*

Because of this Court's decision granting summary judgment to GIC, 842 ECF No. 30, the

Amended Complaint necessarily alters the theory of the original Complaint—namely, that the

actions GIC took to enforce the Deed Covenants violated the FHA—and advances a new theory.

Plaintiffs now allege that GIC violated the FHA and its Maryland counterpart by refusing to grant

the request they made, pursuant to this Court's declaratory judgment, *see* 842 ECF No. 28, to

establish an assisted living facility at Banbury. *See* Am. Compl. ¶¶ 69-158. Yet Plaintiffs still fail

either to adequately allege or to come forward with evidence sufficient to sustain the various claims

of discrimination they make.

It bears noting that, in its prior decision on summary judgment, this Court determined that some of the purported circumstantial evidence of discrimination Plaintiffs cite in their Amended Complaint does not, in fact, betray an intent to discriminate as to Banbury. The Court held that GIC's 2016 rejection of Lussi's suggestion to purchase GIC property in 2016, *see* Am. Compl. ¶¶ 22-31, was "four years" ago, and "this case features a separate transaction involving a different parcel, a different proposal, and different decisionmakers." 842 ECF No. 30 at 15. The Court further held that GIC's decision not to accept Lussi's formal offer in late 2019 to purchase GIC property at 430 Magothy Road, *see* Am. Compl. ¶¶ 36-41, "does not suffice": "The Corporation declined this offer on nondiscriminatory grounds, and Lussi offers no evidence that this rationale was pretextual."[3] 842 ECF No. 30 at 15. Finally, the Court held that a home operated as an assisted living facility is not comparable to, and "totally distinguishable from," homes in which "homeowners routinely rent out their residence for a profit, employ household staff, hold catered events, and receive deliveries or medical care in their homes," and so allowing the latter is not evidence of intentional discrimination in this case. *Id.* at 15-16; SOF ¶ 55 & **Ex. 29** at 62 ("It is

---

[3] In the last weeks of discovery, Plaintiffs supplemented their interrogatory response on damages a second time to suddenly announce they would be seeking damages not only for Banbury, as their initial and first supplemental responses did, but also for GIC's decision not to accept Lussi's 2019 offer on 430 Magothy Road. In so doing, Plaintiffs belatedly and indirectly imply that, in addition to alleging FHA violations as to Banbury, they are alleging *separate* violations as to 430 Magothy. But the Amended Complaint specifies no such violations. Rather, it relies on GIC's alleged actions on 430 Magothy—included in a section titled "GIC's Discriminatory *History* in Attempting to Prevent Group Homes"—as circumstantial evidence to support the claim of intentional discrimination as to Banbury. Moreover, to the extent the Amended Complaint's already duplicitous causes of action could ever be construed to allege violations as to *both* Banbury and 430 Magothy, then they are not only precluded by this Court's prior ruling finding no intent to discriminate, 842 ECF No. 30 at 15, but also are improper under FRCP 10(b), which requires "each claim founded on a separate transaction or occurrence … to be stated in a separate count" for clarity. *See, e.g., Grimsley v. Marshalls of MA Inc.*, 284 Fed. App'x 604, 610 (11th Cir. 2008). Any separate claims Plaintiffs now try to make regarding 430 Magothy must be rejected.

totally distinguishable from someone renting out a home for a period of time on Gibson Island as has been permitted and that is not the same in terms of the nature of the use of the property here.").

## ARGUMENT

Summary judgment is warranted on all of Plaintiffs' claims. Each argument below applies to both counts of the Amended Complaint because the provisions of Maryland's fair housing law, used in Count II, "essentially mirror the protections and prohibitions of the FHA," used in Count I. *Nichols v. Carriage House Condos at Perry Hall Farms, Inc.*, No. 14-cv-3611, 2015 WL 4393995, at *4 n.8 (D. Md. July 15, 2015); *Bd. of Dir. of Cameron Grove Condo., II v. State Comm'n on Human Relations,* 431 Md. 61, 74–75 (2013) (provisions are "nearly identical").

## I. GIC DID NOT REFUSE TO MAKE A REASONABLE ACCOMMODATION NECESSARY TO AFFORD BANBURY'S POTENTIAL RESIDENTS AN EQUAL OPPORTUNITY TO USE AND ENJOY A DWELLING.

To prove under 42 U.S.C.§ 3604(f)(3)(B) that GIC refused to make a reasonable accommodation in its business use prohibition to permit the Banbury facility, Plaintiffs bear the burden of showing that (1) their potential residents have disabilities, (2) they requested an accommodation, (3) an accommodation was both reasonable and necessary to afford the potential residents an equal opportunity to enjoy the housing of their choice; and (4) GIC refused to provide an accommodation. *Bryant Woods Inn, Inc. v. Howard County, Md.*, 124 F.3d 597, 603-04 (4th Cir. 1997); *Bush v. Davis*, No. 09-cv-2002, 2009 U.S. Dist. LEXIS 74987, at *2 (D. Md. Aug. 24, 2009). Plaintiffs' reasonable accommodation claim founders on the third and fourth elements.

### A. Plaintiffs Have Not Established that Their Proposal for Banbury Was "Necessary" to Afford Seniors with Disabilities Equal Opportunity to Use and Enjoy a Dwelling.

"The 'necessary' element . . . requires the demonstration of a direct linkage between the proposed accommodation and the 'equal opportunity' to be provided to the handicapped person. This requirement has attributes of a causation requirement. And if the proposed accommodation

17

provides no direct amelioration of a disability's effect, it cannot be said to be 'necessary.'" *Bryant Woods*, 124 F.3d at 604; *see also Vorcheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 110 (3d Cir. 2018); *Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1190-91 (9th Cir. 2021). "When assessing an FHA reasonable-accommodation request, necessity must be considered in the light of 'proposed alternatives.' . . . Merely being preferable to an alternative is not sufficient; it must be essential." *Harmony Haus Westlake, LLC v. Parkstone Property Owners' Ass'n, Inc.*, 851 Fed. App'x 461, 465 (5th Cir. 2021) (citing *Bryant Woods*, 124 F.3d at 605); *see also Vorcheimer*, 903 F.3d at 103 ("if [a disabled tenant's] landlord offers her an alternative [to her request] that likewise satisfied the need, she has no right to demand the particular accommodation that she wants"), 109-13 ("Section 3604(f)(3)(B) . . . requires courts to consider alternatives.").[4]

Numerous courts have found that a plaintiff cannot satisfy the "necessary" element when a defendant approves an accommodation, but on different terms than the plaintiff demanded, if the plaintiff's terms would not provide essential therapeutic benefits beyond what the defendant approves. For instance, in *Bryant Woods*, the Fourth Circuit held that a group home operator failed to show that increasing the occupancy of his home from 8 authorized residents to 15 was "necessary" because he "presented no evidence . . . that expansion from 8 to 15 residents would be therapeutically meaningful." *Bryant Woods,* 124 F.3d at 605. Similarly, in *Harmony House Westlake,* the Fifth Circuit found that the plaintiff failed to show that allowing 12 people to occupy a sober-living home, rather than the 6 permitted by the defendant homeowner's association, was necessary to enable the home's residents to effectively recover from substance abuse. *Id.* at 466; *see also Lapid-Laurel, LLC v. Zoning Bd. of Adjustment of Tp. of Scotch Plains*, 284 F.3d 442,

---

[4] GIC also vigorously maintains that Plaintiffs will not be able to establish that their request was "reasonable," *i.e.*, that it would not have imposed an undue financial or administrative burden on GIC. GIC is not pursuing this argument on summary judgment.

459–61 (3d Cir. 2002) (plaintiff did not show, as required, that the size of the proposed facility "is required to make it financially viable or medically effective").

*Means v. City of Dayton*, 111 F. Supp. 2d 969 (S.D. Ohio 2000), is in the same vein. The city of Dayton granted the plaintiff a zoning permit to operate a group home for five individuals with mental health disabilities conditioned on providing off-street parking with adequate drainage and a privacy fence. The plaintiff sued, alleging that the FHA forbade imposition of the parking lot conditions. Granting summary judgment to the city, the court held:

> The flaw in the Plaintiff's argument is that she has failed to present evidence which raises a genuine issue of material fact concerning the question of whether such an accommodation was necessary, in other words, that, because of the failure of the Defendant to dispense with the off-street parking requirement, mentally disabled adults have not been able to live with her. Although the failure to dispense with the off-street parking requirement has caused the Plaintiff to incur expenses to remove her garage and to erect a privacy fence, she has not presented evidence tending to demonstrate that her increased costs will prevent mentally disabled individuals from living with her.

*Id.* at 978; *see also Hemisphere Bldg. Co., Inc. v. Vill. of Richton Park*, 171 F.3d 437, 440-41 (7th Cir. 1999); *Gavin v. Spring Ridge Conservancy, Inc.*, 934 F. Supp. 685, 687-88 (D. Md. 1995); *Logan v. Matveevskii*, 57 F. Supp. 3d 234, 263-64 (S.D.N.Y. 2014).

Plaintiffs cannot show that the terms they demanded, as opposed to the MOU terms that GIC twice approved in March 2021, were "necessary." That is, they cannot show that their preferred terms would have "directly ameliorated the effects of the disabilities" of Banbury's potential residents any more than the terms GIC approved. That is because GIC's proposed alternative would have furnished the same therapeutic benefits as Plaintiffs' proposal. GIC's offer did not take issue with the number of residents Plaintiffs wanted. Or with the number of staff Plaintiffs planned to employ. Or with the daily activities Plaintiffs suggested. Or with anything else affecting the therapeutic benefits of congregate living for seniors with disabilities.

The material points of disagreement between Plaintiffs and GIC in the end were limited to the Guarantor, Septic, Dispute Resolution, and Arbitration Escrow Provisions. SOF ¶ 102; Am. Compl. ¶ 1. *Not one* of these provisions would have denied Banbury's potential residents an equal opportunity to use and enjoy Banbury or diminished the benefits the facility would have provided them. Spewing torrents of vitriol, Lussi objected to these provisions. But "[m]erely being preferable to an alternative is not sufficient; it must be essential." *Harmony Haus Westlake*, 851 Fed. App'x at 465. And Plaintiffs have presented *zero* evidence that removing these provisions from an agreement was essential, or "necessary," to making Banbury therapeutically beneficial for its potential residents. *Bryant Woods*, 124 F.3d at 605. The required "causal link" between removing these provisions and ameliorating the effects of the residents' disabilities is absent.

Like a county or homeowners' association that authorizes a group home for a sufficient number of residents to achieve therapeutic benefits, but not as many as the operator wants, *see id*; *Harmony House Westlake,* 851 Fed. App'x at 466, or a city that approves a zoning permit for a group home but conditioned on on-site parking, *Means*, 111 F. Supp. 2d at 978, GIC approved a robust alternative that would have provided Banbury's residents a home on Gibson Island and would have furnished them medical benefits no less than Plaintiffs' preferred agreement. For this reason, Plaintiffs cannot satisfy the necessity element of Section 3604(f)(3)(B).

### B.     Rather than Refusing to Make a Reasonable Accommodation, GIC Approved One—Twice.

Under Section 3604(f)(3)(B), no violation occurs unless and until there is a denial of—or, in the words of the statute, a "refusal to make"—an accommodation. *Bryant Woods*, 124 F.3d at 602 ("a violation occurs when the disabled resident is first denied a reasonable accommodation"); *Schwartz v. City of Treasure Island*, 544 F.3d 1201, 1219 (11th Cir. 2008) ("A plaintiff must actually request an accommodation *and be refused* in order to bring a reasonable accommodation

claim . . . .”). Approving an accommodation without every feature a plaintiff demands does not qualify as a refusal. “A plaintiff is not entitled to the accommodation of his or her choice, but is entitled only to a reasonable accommodation.” *Davis v. Habitat for Humanity of Bay Cnty., Inc.*, 558 Fed. App’x 850, 852 (11th Cir. 2014) (citation omitted); *see also Hemisphere Building Co.,* 171 F.3d at 440-41; *Groteboer v. Eyota Econ. Dev. Auth.,* 724 F. Supp. 2d 1018, 1024-25 (D. Minn. 2010).

In this case, GIC did not refuse Plaintiffs’ request to open an assisted living facility. To the contrary, GIC approved the request—twice. SOF ¶¶ 100, 102. Each time, Plaintiffs refused to accept the approval. SOF ¶¶ 101, 103. On March 18, 2021, GIC President Cecala informed Plaintiffs that “the Board has decided that it will **approve** your proposed business use of 1753 Banbury upon your acceptance of the terms of the attached MOU.” SOF ¶ 100. After two months of negotiations in which Lussi repeatedly denigrated GIC and engaged in bizarre, counterproductive tactics like demanding that GIC answer a questionnaire ham-handedly crafted for litigation, this was GIC’s best and final offer. SOF ¶¶ 86-100. Plaintiffs balked. Rather than accepting the offer, Lussi responded with a revised MOU, a continued focus on irrelevancies raised before, and repeated, false accusations of misconduct and discrimination. SOF ¶ 101.

On March 26, GIC tried again. Cecala sent Plaintiffs an email making clear that GIC was approving the facility based on the MOU sent on March 18. SOF ¶ 102. Cecala explained why each of the disputed provisions resolved by the approved MOU was vital to protecting GIC’s interests. *Id.* In a large package sent to GIC on April 5, Lussi not only refused to accept, but also delivered a 49-page single-spaced rant that “[made] clear that [he had] no interest in a mutually agreeable resolution” and “[i]nstead … appear[ed] intent on waging imagined battles over issues that have zero relationship to the establishment and operation of a group home for seniors with disabilities.” SOF ¶ 103.

By approving Banbury and providing its potential residents the opportunity to live there, GIC complied with its obligations under Section 3604(f)(3)(B). Plaintiffs objected to the four material provisions that GIC's final proposed MOU resolved—that, or Lussi relished the fight and was trying to "score points." But Plaintiffs were "not entitled to the accommodation of their choice … only to a reasonable accommodation." *Davis*, 558 Fed. App'x at 852. That is what GIC gave them. The Guarantor, Dispute Resolution, and Arbitration Escrow Provisions were all sensibly designed to deter Lussi from embroiling GIC in the same type of dispute that had required GIC to spend hundreds of hours and hundreds of thousands of dollars simply to get him to comply with the Deed Covenants. SOF ¶ 102. And as Cecala explained, there was nothing unreasonable about the Septic Provisions, given the environmental sensitivity of Gibson Island and Plaintiffs' plan to increase the occupancy of Banbury to nine full-time residents and one to three employees at any given time. Indeed, as revealed in the Amended Complaint, Plaintiffs easily engaged a specialist to examine the adequacy of the septic system right after Lussi's vehement April 5 rejection of the final MOU with the Septic Provisions. Am. Compl. ¶ 90(j); SOF ¶¶ 102, 108. Inclusion of the disputed provisions does not come close to a "refusal to make" a reasonable accommodation.

Plaintiffs have indisputably failed to satisfy Section 3604(f)(3)(B)'s "refusal" element.

\*\*\*

Because Plaintiffs cannot satisfy either the necessity or the refusal requirement of Section 3604(f)(3)(B), summary judgment is warranted on their reasonable accommodation claim.

## II.    GIC DID NOT INTENTIONALLY MAKE UNAVAILABLE OR DENY HOUSING BASED ON THE DISABILITIES OF BANBURY'S POTENTIAL RESIDENTS.

42 U.S.C. § 3604(f)(1) prohibits "otherwise mak[ing] unavailable or deny[ing]" housing because of disability. The words "make unavailable" and "deny" are accorded their plain meaning. *Edwards v. Johnson Cnty. Health Dep't*, 885 F.2d 1215, 1222 (4th Cir. 1989).

To sustain a Section 3604(f)(1) intentional discrimination claim on summary judgment, a plaintiff must either furnish direct evidence of discriminatory intent or satisfy the elements of the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Pinchback v. Armistead Homes, Inc.*, 907 F.2d 1447, 1452 (4th Cir. 1990); *Letke v. Wells Fargo Home Mortg., Inc.*, No. 12-cv-3799, 2013 WL 6207836, at *3 (D. Md. Nov. 27, 2013). Direct evidence is "conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested [housing] decision." *Letke*, 2013 WL 6207836, at *3 (citing *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013)). Statements may constitute direct evidence of discrimination, but only if they were "derogatory," "were related to the alleged discriminatory decision[,] . . . were not stray or isolated," *Proa v. NRT Mid Atlantic, Inc.*, 618 F. Supp. 2d 447, 467 (D. Md. 2009) (citation omitted), and "were made by an actual decisionmaker." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 314 F.3d 657, 665, 673 (4th Cir. 2003).

### A.      Plaintiffs Rely Exclusively on Circumstantial Evidence.

Plaintiffs do not offer direct evidence of discrimination. Each category of evidence they rely on requires one to *infer* discriminatory intent. Plaintiffs cite GIC's rejection of Lussi's suggestions to buy property on Magothy Road in 2016, its rejection of Lussi's formal offer to buy 430 Magothy Road in December 2019-January 2020, and the existence of private homes that are periodically rented, employ household staff, hold catered events, and receive deliveries or in-home care. *See* Am. Compl. ¶¶ 20-31, 36-41, 49-62, 107-18. Setting aside that this Court has already ruled that none of these allegations prove intent, 842 ECF No. 30 at 15-16, none of them "reflect directly the alleged discriminatory attitude" or "bear directly on" GIC's challenged actions regarding Banbury. *Letke*, 2013 WL 6207836, at *3. The same is true of the circumstances Plaintiffs allege regarding GIC's actions and decisions on Plaintiffs' applications for a business use and exterior improvements at Banbury, Am. Compl. ¶¶ 65-143, the allegedly differential

treatment Banbury has received compared to other Island homes and properties, *id.*, the "shifting rationale" GIC has supposedly offered in response to Lussi's different proposals for a group home, *id.* ¶¶ 144-51, and GIC's allegedly retaliatory actions against the Lussis. *Id.* ¶¶ 12, 153-57.

To divine an intent to discriminate against individuals with disabilities from any of these allegations—which GIC vigorously contests—requires inferences to be drawn. There is no allegation that GIC pointed to the disabilities of Banbury's potential residents as the reason for any action adverse against Plaintiffs. *Compare Corey v. Sec'y U.S. Dep't HUD ex. rel. Walker*, 719 F.3d 322, 326-27 (4th Cir. 2013) (finding direct evidence where defendant "admitted to imposing conditions, both verbally and in writing, on the Walkers' prospective tenancy because of [plaintiff's] disability"). Plaintiffs thus rely on circumstantial evidence to mount their case.

### B.     Plaintiffs Have Not Made a *Prima Facie* Case of Intentional Disability Discrimination.

Because Plaintiffs offer no direct evidence, the *McDonnell Douglas* framework applies. To prove a *prima facie* case of discrimination under that framework where, as here, a group home operator challenges the discriminatory application of facially neutral land use rules, the operator must establish that: (1) it is associated with individuals with disabilities; (2) it applied for and was qualified to receive authorization to operate; (3) authorization was denied despite its qualifications; and (4) another homeowner sought and was given authorization for a like use for individuals without disabilities relatively near the time of the challenged denial. *Gamble v. City of Escondido*, 104 F.3d 300, 305 (9th Cir. 1997); *Daveri Dev. Grp., LLC v. Vill. of Wheeling*, 934 F. Supp. 2d 987, 997-99 (N.D. Ill. 2013). Plaintiffs fail to satisfy both the third and fourth requirements.

1.    *Because GIC Twice Approved an Assisted Living Facility at Banbury, It Did Not "Otherwise Make Unavailable or Deny" Housing to Banbury's Potential Residents.*

Plaintiffs cannot establish that GIC made unavailable or denied housing to Banbury's potential residents. As explained at length above, that is because GIC twice *approved* an assisted living facility at Banbury—first on March 18, 2021, and again on March 26. *See* Section I.B., *supra*. Plaintiffs cannot complain of a "denial" of housing when they rejected GIC's approvals. *See, e.g., Edwards*, 885 F.2d at 1222 (according "deny" its plain meaning). Nor can they plausibly contend that the four material points of disagreement that GIC resolved in its approvals somehow amounted to a denial. To conclude otherwise would be to stretch the words "otherwise make unavailable or deny" well beyond their plain meaning. *See id.*; *Fair Hous. Ctr. of the Greater Palm Beaches, Inc. v. Sonoma Bay Cmty. Homeowners Ass'n, Inc.,* 136 F. Supp. 3d 1364, 1370-71 (S.D. Fla. 2015) ("Section 3604(a) . . . addresses a concrete refusal . . . ."; placing conditions on rental application "does not mean that housing will be refused").

2.    *GIC Did Not Approve a Similar Opportunity for Another Private Home.*

The fourth element of a *prima facie* case requires a plaintiff to show that, around the same time they were denied housing, the defendant granted a similar request to an individual or entity not of their protected class. *Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City*, 685 F.3d 917, 920 (10th Cir. 2012) ("To meet this burden [of proving a denial because of disability], Cinnamon Hills must produce evidence suggesting that the city denied to it zoning relief granted to similarly situated applicants without disabilities."); *Gamble*, 104 F.3d at 305; *cf. Gerner v. Cnty. of Chesterfield*, 674 F.3d 264, 266 (4th Cir. 2012) (fourth element under Title VII is "that similarly-situated employees outside the protected class received more favorable treatment").

Plaintiffs have presented no evidence that GIC has recently approved any application for a business use in a private home or has otherwise informally permitted such use. Plaintiffs continue

to argue that GIC permits other homeowners to rent their homes on a periodic basis. *See* Am. Compl. ¶¶ 124-25. But as this Court already found, periodic home rentals are "totally distinguishable" from Plaintiffs' planned business use of Banbury. 842 ECF No. 30 at 15-16; SOF ¶ 55 & **Ex. 29**. That is law of the case, which precludes Plaintiffs from making the argument again. *See Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017).

Plaintiffs also point to the transfer of GIC property to a church for religious (not "business") use in 1947; the transfer of GIC property to Anne Arundel for a water treatment plant in 1951; the decades-long use of one small building for GIC's realty office and a U.S. Post Office and another small building for GIC's Island Services office; and long-ago allowances for the Gibson Island Club to use GIC-leased land for "food and beverage," "a ten-room hotel," "a three-bedroom rental house," "sports activities," a "youth camp," a "yacht squadron," and a "boat works." *See* Am. Compl. ¶ 106. As GIC President Cecala attests, none of these uses involves a private home, none is remotely similar to the use Plaintiffs propose, and all were authorized years ago, far too remote in time to satisfy the fourth *prima facie* case requirement. SOF ¶¶ 110-111 & **Ex. 44** ¶ 14. *Gamble*, 104 F.3d at 305 ("Initially, we note that on its face, Gamble's complaint does not present a prima facie case because he does not allege that the City granted a permit to a similarly situated party relatively near the time the City denied his permit."); *Cinnamon Hills Youth Crisis Ctr., Inc.*, 685 F.3d at 920-921 (affirming summary judgment where plaintiffs "failed to show a similarly situated group has been granted zoning relief remotely like the requested variance").

***

Because Plaintiffs do not satisfy either the third or fourth requirement of a *prima facie* case of intentional discrimination under Section 3604(f)(1), summary judgment is warranted.

26

### III. GIC DID NOT DISCRIMINATE IN THE TERMS, CONDITIONS, OR PRIVILEGES OF THE SALE OR RENTAL OF BANBURY, OR IN THE PROVISION OF SERVICES OR FACILITIES THERE.

42 U.S.C. § 3604(f)(2) prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap . . . ." To sustain a Section 3604(f)(2) claim, Plaintiffs must prove (1) they were subjected to conditions in the sale or rental of housing, or provided services or facilities in connection with housing, different from others and (2) the differences were "because of" disability. *See, e.g., Roberson v. Graziano*, No. 09-cv-3038, 2010 WL 2106466, at *2 (D. Md. May 21, 2010), *aff'd* 411 Fed. App'x 583 (4th Cir. 2011); *Adams v. Cameron*, No. 20-cv-3739, 2021 WL 5280978, at *5 (D. Md. Nov. 12, 2021) (under companion provision, Section 3604(b)).

Attempting to fit a square peg in a round hole, Plaintiffs are using Section 3604(f)(2), as they are using Section 3604(f)(1), to challenge the purported *denial* of housing to Banbury's potential residents—not alleged discrimination in terms, conditions, privileges, services, or facilities. When asked for all facts supporting their Section 3604(f)(2) claim, Plaintiffs responded:

> In summary, GIC has expressly stated that it is against the concept of an assisted living group home since at least 2016 and has stated its willingness to act and has acted by any legal or extra-legal means necessary to prevent Plaintiffs' planned assisted living group home for the disabled from opening. GIC has done so in coordination with residents and non-residents. GIC has adopted and acted on statements reflective of animus toward elderly disabled individuals, particularly those living in a group home setting as opposed to their own individual homes, including but not limited to imposing waste removal requirements so materials with group home residents' bodily fluids on them are not collected and co-mingled with the larger community's trash.

SOF ¶ 113.

Under the plain language of the statute, this is not a Section 3604(f)(2) claim. A claim under (f)(2) or its companion, Section 3604(b), involves differential rent, security deposits, lease

terms, access to amenities, or maintenance and repair service in rental situations; differential down payment and closing requirements in sales situations; failures to process or accurately communicate offers for sale or rental; or limits on the use of privileges, services or facilities associated with a home. *See* 24 C.F.R. § 100.65(b) (HUD regulation addressing discrimination in terms, conditions, services and facilities). "Act[ing] by any extra legal or extra-legal means necessary *to prevent" a group home "from opening*," SOF ¶ 113, is not in these categories. It is a claim alleging the *denial* of housing—a Section 3604(f)(1) claim.

As one court put it, Plaintiffs' allegations "do not address the terms, conditions, privileges or services offered in connection with the sale or rental of the assisted living facility. The sale of the property was complete before [GIC] became involved, and [GIC is] not involved in the rental of the facility. In addition, [Plaintiffs'] factual allegations . . . do not address the provision of services or facilities by [GIC]." *Sunrise Dev., Inc. v. Lower Makefield Twp.*, No. 2:05-cv-02724, 2006 U.S. Dist. LEXIS 4107, at *8 n. 7 (E.D. Penn. Jan 23. 2006) (citing *Growth Horizons, Inc. v. Delaware Cnty.*, 983 F.2d 1277, 1284 n.12 (3d Cir. 1993)). Under the plain language of the statute, Plaintiffs do not make a Section 3604(f)(2) claim.

The terms of the proposed MOU that Plaintiffs twice rejected—which Plaintiffs cite to support the allegation that the purported *denial* of housing was discriminatory, *see* Am. Compl. ¶ 90—do not make it otherwise. These MOU terms did not implicate the terms, conditions, or privileges of the Hennessy-Franco sale of Banbury to GHGI (which was complete before GIC knew of it) or the rental of Banbury rooms (which had not yet occurred and in which GIC would not be involved), or the provision of any GIC services or facilities to Banbury. SOF ¶ 102.

And even if Plaintiffs' complaint about these MOU terms could somehow be shoehorned into Section 3604(f)(2), none of those terms establish a *prima facie* case of discrimination because

none are animated by, or "because of," the disabilities of Banbury's potential residents.[5] *Compare Corey*, 719 F.3d at 327. Plaintiffs ultimately disputed only a few material MOU terms. SOF ¶ 102. Most of them—the Guarantor Provision, the Dispute Resolution Provision, and the Arbitration Escrow Condition—were about disincentivizing Lussi from picking more costly fights and ensuring speedy resolution and adequate remedies if he did. *Id.* They had nothing to do with the disabilities of Banbury's potential residents. The same is true of the remaining disputed provisions, the Septic Provisions. Those were plainly about the substantial increase in the number of full-time occupants of Banbury, not their disabilities. *Id.*

Because Plaintiffs have neither alleged nor adduced sufficient evidence to sustain a Section 3604(f)(2) claim, GIC is entitled to summary judgment on that claim.

---

[5] Plaintiffs also badly mischaracterize the terms of GIC's proposed MOU. Just a few examples: (1) While Plaintiffs allege "GIC required all employees, agents, visitors, invitees, or licensees of the Lussis and the residents to be 'accompanied' on the 2,800 feet of HOA owned road from the Gibson Island gate to the group home and anywhere else on the Island," Am. Compl. ¶ 90(m), GIC requires all guests of any shareholder to be accompanied or otherwise supervised on GIC property. *See* SOF ¶ 115. Moreover, the MOU specifically stated that visitors "do not need to be accompanied as they drive directly to and from the Gatehouse to Banbury." SOF ¶ 102 & **Ex. 68** at GIC014698. (2) Plaintiffs claim "GIC required $6 million of insurance," when in fact GIC initially came up with that figure because Lussi *offered* it, SOF ¶ 116, but then, on Lussi's request, reduced it to "the total amount of at least the one million dollars that Mr. Lussi has represented is his current coverage." *Compare* Am. Compl. ¶ 90(e) *and* **Ex. 68** at GIC014696. And, (3) Plaintiffs allege "GIC required a separate list for gate house access to the group home's disabled residents, employees, agents, visitors, invitees or licenses to be provided to the General Manager of the HOA and Club," but the relevant MOU provision did not apply to residents or their house guests and, for ease of access, would simply establish that, as with other regular visitors, the Gatehouse and manager maintain a list of "full- or part-time employees who will have Gatehouse access on a daily or otherwise regular basis" and that "individual service providers to be admitted upon receipt at the Gatehouse of a telephone message from [Plaintiffs'] manager." SOF ¶ 117; *compare* Am. Compl. ¶ 90(k) *and* **Ex. 68** at GIC014697. Other "conditions" that Plaintiffs allege were, in fact, never part of any proposed MOU or were resolved in GICs final MOU. SOF ¶ 118; *compare* Am. Compl. ¶¶ 90 (g), (l), (o), (t), & (u), *with* **Ex. 68** at GIC014695.

**IV.    PLAINTIFFS DO NOT HAVE STANDING TO CLAIM, AND IN ANY EVENT
HAVE NOT ADEQUATELY ALLEGED OR PROVEN, THAT GIC
RETALIATED AGAINST LUSSI FOR EXERCISING FAIR HOUSING RIGHTS
BY DEFAMING HIM.**

42 U.S.C. § 3617 makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by" the other provisions of the FHA. To establish coercion, intimidation, threats or interference, a plaintiff must prove: "(1) [they were] engaged in a protected activity; (2) the defendant was aware of that activity; (3) the defendant took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action." *Hall v. Greystar Mgmt. Servs., L.P.*, 28 F. Supp. 3d 490, 495 (D. Md. 2014) (citation omitted).

An "adverse action" is one that could well "dissuad[e] a reasonable [person] from making or supporting a charge of discrimination." *Id.* (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006)); *see also Geraci v. Union Square Condo. Ass'n*, 891 F.3d 274 (7th Cir. 2018). Therefore, "a plaintiff must demonstrate either the use or threatened use of some type of force or duress—physical, economic, emotional—for the purpose of denying the plaintiff his housing rights." *Pate v. Tucker*, No. 06-cv-936, 2007 WL 9780573, at *6 (D. Md. Jan 11, 2007) (citation omitted); *see also Clark v. 100 Harborview Drive Council of Unit Owners*, No. 14-cv-3122, 2016 WL 1159198, at *10 (D. Md. Mar. 23, 2016) ("[i]nterference is more than a quarrel among neighbors or an isolated act of discrimination but rather is a pattern of harassment, invidiously motivated") (citation and quotations omitted).

Plaintiffs allege that GIC violated Section 3617 by "retaliat[ing] against Plaintiffs' principals" for their "continued efforts to secure the rights of seniors with disabilities to live in a home of their choice on Gibson Island, including but not limited to a false light portrayal of

[Lussi]." Am. Compl. ¶ 12; *see also* SOF ¶ 114 & **Ex. 75** (responding to interrogatory asking for "all facts" supporting Section 3617 claim by stating "GIC … has launched and participated in an ad hominem campaign against Craig Lussi to portray him as the reason [for its actions] . . . .").[6]

Plaintiffs' claim fails for lack of standing. Plaintiffs—two companies—do not allege that GIC harmed *them* in retaliation for exercising FHA rights. They allege that GIC falsely portrayed Lussi, a non-party. Plaintiffs do not have standing to allege that another person or entity was falsely portrayed or defamed in violation of Section 3617. *See Norman v. Borison*, 192 Md. App. 405, 422 & n.11 (2010).

Even if Plaintiffs had standing, the "false light portrayal" and "ad hominem campaign" Plaintiffs allege do not qualify as "adverse action." These unspecified acts do not entail the use or threatened use of force or duress, *Pate,* 2007 WL 9780573, at *6, and would not "dissuade a reasonable person from making or supporting a charge of discrimination." *Hall*, 28 F. Supp. 3d at 495. Lussi's own strident actions in the face of GIC's purported "campaign" prove as much, as he "continues to be undeterred in his pursuit of a remedy." *Williams v. Arora Hills*, No. 19-cv-3370, 2021 WL 2226199, at *12 (D. Md. June 2, 2021); *Clark*, 2016 WL 1159198, at *10-12.

Finally, even if the defamation Plaintiffs generically allege qualified as "adverse action," their evidence cannot defeat summary judgment. To establish defamation or false light under

---

6 This interrogatory response also alleges that GIC violated Section 3617 by (1) "adopt[ing] and act[ing] upon statements reflecting GIC's animus toward elderly disable individuals and their caregivers, particularly those living in a group home setting as opposed to in individual homes" and (2) "delaying and refusing to engage in the required interactive process both in and out of litigation amounting to a denial of reasonable accommodations, all of which has to date prevented elderly disabled residents from enjoying life on Gibson Island in a group home environment . . . ." SOF ¶ 114. On their face, these are allegations of violations of the substantive rights protected by Section 3604(f), which prohibit making housing unavailable and refusing to make reasonable accommodations. They are not allegations that GIC coerced, intimidated, threatened, or interfered with Plaintiffs for having exercised those rights, and so do not fall under Section 3617.

Maryland law, one must prove "(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Piscatelli v. Van Smith*, 424 Md. 294, 306 (2012). Plaintiffs have never identified a specific false light or defamatory statement that GIC made during or after Plaintiffs' attempt to open a group home at Banbury.[7] Nor have Plaintiffs explained or proven the falsity of any such statement. Nor have they identified any tangible harm to them (or Lussi). Without alleging, much less proving, the key elements of false light, Plaintiffs have no claim for a Section 3617 violation based on false light portrayal of Lussi, *See, e.g., Xiangyuan Zhu v. Countrywide Realty Co.*, 165 F. Supp. 2d 1181, 1197 (D. Kan. 2001).

For all these reasons, summary judgment is warranted on Plaintiffs' Section 3617 claim.

## V.   PLAINTIFFS HAVE NOT ALLEGED, MUCH LESS PROVEN, A DISPARATE IMPACT CLAIM.

"[A] plaintiff bringing a disparate-impact claim [under the FHA's 'make unavailable' provision] challenges practices that have a disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 524-25 (2015) (internal citation and quotations omitted). To adequately allege disparate impact, "[a] plaintiff must identify the neutral practice at issue and cite statistical evidence demonstrating the discriminatory impact caused by the practice." *Glenn v.*

---

7 The Amended Complaint states that GIC issued "a knowingly false Board Resolution on November 23, 2019 stating that Mr. Lussi's lawful pursuit of Peace Orders was unjustified and improper." Am. Compl. ¶ 33. This resolution *predates* GIC learning of Plaintiffs' plans for Banbury on March 25, 2020, four months later, as well as Plaintiffs' offer to purchase 430 Magothy on December 5, 2019, two weeks later. GIC could not possibly have passed the resolution in retaliation for these actions. If Plaintiffs are alleging that GIC passed the resolution to retaliate against Lussi for trying to establish a different group home off Gibson Island prior to the resolution, that far-fetched claim fails for all the other reasons set forth above—the resolution does not qualify as "adverse action," and Plaintiffs do not specify a defamatory statement within the resolution, have not established its falsity, and have not shown they (or Lussi) were tangibly harmed.

*Wells Fargo Bank, NA*, No. 15-cv-3058, 2016 WL 3570274, at *6 (D. Md. July 1, 2016) (citation

omitted). The statistical evidence must show that the challenged practice has a disparate impact on

a protected class—here, people with disabilities—as compared to people outside the protected

class. *Id.* And the plaintiff's proof of the causal connection between the challenged practice and

its disparate impact must be "robust." *Inclusive Communities*, 576 U.S. at 542-43; *Reyes v. Waples*

*Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 419 (4th Cir. 2018).

> When asked to state all facts supporting their disparate impact theory, Plaintiffs responded:

>> In summary, GIC applies facially neutral rules and regulations in a way that affects Plaintiffs and their future residents differently than other properties that are homes and properties the GIC categorizes as businesses on Gibson Island that are allowed and encouraged. GIC employs the Deed Covenants the GIC admits it has no right to, Architectural Review rules, critical area regulations, septic and waste removal regulations, and new, evolving GIC restrictions on an assisted living group home use exclusively serving the disabled that are not imposed on the other existing homes with and without caregivers and or business uses not exclusively serving the disabled in a manner that negatively impacts Plaintiffs to a greater degree than other properties and property owners who have been and are operating a business use or whom the GIC determines are seeking a business use. Additionally, GIC applies these various standards under the guise of a case-by-case determination when the outcome has already been decided to disallow any group home contemplated by Plaintiffs. The delay inherent in applying these restrictions, as well as GIC's undue additional delay and refusal to engage in the interactive process, also disproportionately negatively affects Plaintiffs.

SOF ¶ 112. This response echoes the two (and only two) passing, unadorned references to

"disparate impact" in the Amended Complaint. *See* Am. Compl. ¶¶ 141, 152.

> Plaintiffs' claim falters at every turn. At the threshold, Plaintiffs are challenging a single

act—the alleged refusal to permit Plaintiffs to establish Banbury—not the neutral application of a

rule that broadly has a disparate impact on a protected class as a whole. Thus, Plaintiffs have

"fail[ed] even to identify a neutral policy or program implemented by [GIC] that caused a

significant disparate impact on a protected class." *Glenn*, 2016 WL 3570274, at *6; *see also*

*Inclusive Communities*, 576 U.S. at 543-44 (plaintiffs will have "difficulty" showing a "one-time

decision" causes a disparate impact because it "may not be a policy at all"); *Ellis v. City of Minneapolis,* 860 F.3d 1106, 1113 (8th Cir. 2017) (rejecting effort to "bootstrap" a series of one-time decisions to allege the existence of a policy); *City of Joliet v. New W., L.P.*, 825 F.3d 827, 830 (7th Cir. 2016) ("Disparate-impact analysis looks at the effects of policies, not one-off decisions, which are analyzed for disparate treatment."). Indeed, Plaintiffs do not specify a GIC policy with an alleged disparate impact. Instead, they complain that GIC has selectively applied—in *this* case, to *them*—a constellation of rules, including "the Deed Covenants . . ., Architectural Review rules, critical area regulations, septic and waste removal regulations, and new, evolving GIC restrictions on assisted living group home use." SOF ¶ 112. Summary judgment is warranted on this ground alone.

Plaintiffs' claim is flawed in three other fatal ways. Each of these flaws necessarily follows from the threshold flaw, and each also independently warrants summary judgment.

*First*, Plaintiffs allege that GIC is discriminatorily applying certain rules against them in this case—not, as required, that GIC is neutrally applying a rule with disparate effects on people with disabilities generally. At root, Plaintiffs are making disparate *treatment* allegations, not disparate *impact* allegations. *See, e.g.*, *2922 Sherman Ave. Tenants' Ass'n v. D.C.*, 444 F.3d 673, 681-82 (D.C. Cir. 2006); Robert G. Schwemm, *Housing Discrimination Law and Litigation* §10.6 ("the challenged policy must be neither discriminatory on its face nor applied in a discriminatory manner, for these situations would present claims of intentional discrimination").

*Second*, Plaintiffs do not allege that a specific GIC rule adversely affects people with disabilities *as compared to people without disabilities*, and so offer none of the requisite statistical evidence of comparative impact. *See, e.g.*, *Glenn*, 2016 WL 3570274, at *6; *Bryant Woods Inn, Inc. v. Howard Cnty.*, 911 F. Supp. 918, 939-40 (D. Md. 1996); *Letke*, 2015 WL 1438196, at *8; Schwemm § 10.6 ("If a facially neutral policy is identified, the next step is for the plaintiff to

present statistical evidence showing that this policy has a greater impact on protected class members than on others.") (collecting cases); *compare Reyes*, 903 F.3d at 421-22, 428-29 & n.11 (plaintiffs offered detailed statistical evidence showing comparative impact).

*Third*, having failed to produce any evidence of comparative impact, Plaintiffs necessarily fail to demonstrate a "robust" causal connection between a GIC rule and any disparity. *Inclusive Communities*, 576 U.S. at 542-43; *Reyes*, 903 F.3d at 419, 424-29.

Plaintiffs have not even alleged disparate impact, much less offered supporting evidence. GIC is thus entitled to summary judgment on Plaintiffs' disparate impact claim.

## CONCLUSION

The Court should grant summary judgment to GIC on all of Plaintiffs' claims. Because GIC approved a robust alternative to Plaintiffs' proposal for Banbury, Plaintiffs cannot satisfy the *prima facie* elements of either their Section 3604(f)(3)(B) reasonable accommodation claim or their Section 3604(f)(1) "make unavailable or deny" intentional discrimination claim. Further, Plaintiffs have not even alleged, much less adduced evidence to sustain, their Section 3604(f)(2) terms-conditions-services-facilities claim or their disparate impact claim. Finally, Plaintiffs do not have standing to assert a Section 3617 retaliation claim on behalf of Lussi or anyone else, nor have they produced evidence establishing Section 3617 retaliation. This case should be dismissed.

Respectfully Submitted,

/s/ Seth A. Rosenthal
Seth A. Rosenthal (Bar # 10780)
Katherine W. Morrone (Bar # 21810)
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
Tel: (202) 344-4000
sarosenthal@venable.com
kwmorrone@venable.com

/s/ Craig D. Roswell
Craig D. Roswell (Bar # 09529)
NILES BARTON AND WILMER LLP
111 S. Calvert Street, Suite 1400
Baltimore, Maryland 21202
Tel: (410) 783-6300
cdroswell@nilesbarton.com

*Attorneys for Gibson Island Corporation*

*Attorneys for Gibson Island Corporation*