**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
Northern Division

GROUP HOME ON GIBSON ISLAND, LLC,
et al.,

                      Plaintiffs,

        v.

GIBSON ISLAND CORPORATION,

            Defendant.

Civil Action No. 1:20-cv-00891-DLB

---

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE IN SUPPORT OF GIBSON
ISLAND CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

    1.    The 200-plus lots on Gibson Island are encumbered by restrictive covenants that have run with the land since the early 20th century. **Ex. 1** (Deed and Agreement for 1753 Banbury ("Deed Covenants")); **Ex. 2** (No. 1:20-cv-00842-RDB, ECF No. 30 at 3 (D. Md. June 5, 2020) ("Court's Memorandum Opinion")).

    2.    1753 Banbury Road ("Banbury") is encumbered by these Deed Covenants. **Ex. 1**.

    3.    The Deed Covenants prohibit Gibson Island homes from being used as businesses without GIC's prior approval. They state: "[B]uildings may also be erected, maintained or used for business purposes in such locations as may be approved by the Company, provided, however, that no building shall be erected, maintained or used for any of the said purposes except by the Company, unless in each case there shall have been filed in the proper office of record a deed or other instrument in writing executed by the Company approving, specifying and limiting the uses to which such building may be put or the business which may be conducted therein." *Id.* at 7.

1

4.     The Deed Covenants prohibit exterior improvements to Island homes without prior GIC review and approval. They state: "No building, fence, wall, drainage or sewerage system or other structure shall be commenced, erected or maintained on said tract, nor shall any addition to or change or alteration therein be made, until the plans and specifications, showing the nature, kind, shape, height, materials, floor plans, color scheme, location, and approximate cost of such structure and the grading plan of the plot to be built upon shall have been submitted to and approved in writing by the Company and a copy thereof, as finally approved, lodged permanently with the Company. The Company shall have the right to refuse to approve any such plans or specifications or grading plan, as are not suitable or desirable, in its opinion, for aesthetic or other reasons, and in so passing upon such plans, specifications and grading plan, it shall have the right to take into consideration the suitability of the proposed building or other structure and of the materials of which it is to be built to the site upon which it is proposed to erect the same, the harmony thereof with the surroundings and the effect of the building or other structure, as planned and located, on the outlook from the adjacent or neighboring property." *Id.* at 9.

5.     GIC has delegated the initial review of exterior home improvements to its Architectural Review Committee ("ARC"). **Ex. 3** (GIC Architectural Guidelines and Committee Procedures) at 1; **Ex. 4** (Jost Decl.) ¶¶ 6-8, 28.

6.     The Architectural Review Committee furnishes all homeowners with the review procedures in a detailed document titled "Procedures for Approval of Demolition, New Construction and Exterior Changes or Improvements of Property on Gibson Island." **Ex. 3**.

7.     Through the ARC, GIC has rigorously and consistently enforced the exterior improvements covenant.  **Ex. 2** at 3; *see also* **Ex. 4** ¶¶ 13-16; **Ex. 5** (Greenberg Decl.) at Attach. A.

2

8.      Prior to Plaintiffs seeking approval to operate an assisted living facility at 1753 Banbury in June 2020, GIC had neither received nor approved a request from a private homeowner to erect, maintain or use their home as a business on Gibson Island.  **Ex. 2** at 3-4; **Ex. 6** (Daly Decl.) ¶ 8.

9.      On several different occasions since 2000, including as recently as 2016, Craig Lussi ("Lussi") submitted proposals to the ARC for improvements to his own home. **Ex. 4** ¶¶ 22-27 & Attach. D.

10.     Group Home Gibson Island, LLC ("GHGI") is a for-profit limited liability company. **Ex. 7** (GHGI Articles of Organization).

11.     GHGI is owned and operated by Lussi for the purpose of "Group Home and Real Estate Activities." *Id.*

12.     Lussi and GHGI plan to utilize a for-profit management company, Assisted Living Well Compassionate Care 2, LLC ("ALW2"), to manage their planned assisted living facility at 1753 Banbury. **Ex. 8** (Dec. 31, 2019, Lussi Email to Cindy Riggs, Anne Arundel Co.); **Ex. 9** (ALW2 Articles of Organization).

13.     ALW2 is also controlled by Lussi. *Id.* (listing Lussi as Resident Agent and Authorized Person); **Ex. 8** (noting in signature block that Lussi is the Managing Member of ALW2).

14.     On November 23, 2019, GIC unanimously adopted a resolution that condemned Lussi for a series of aggressive actions toward seven different individuals, including several women he intimidated; cited a state court judge's observation that, despite filing for peace orders, Lussi was actually the one who had engaged in "harassment"; and instructed Lussi to

"refrain from such conduct in the future directed at any member of the Gibson Island community." **Ex. 6** ¶¶ 17-19 & Attach. C (GIC resolution).

15.     On November 26, 2019, non-party Gibson Island Club voted to expel Lussi from its membership, citing "behavior including verbal harassment, inappropriate public outbursts directed toward women and staff, stalking, physical intimidation, unwanted video recording and improper use of judicial proceedings filed against Club members and a Club employee" and "an Anne Arundel County judge recently describ[ing] some of your actions directed toward certain Club members as constituting harassment." *Id.* ¶ 19 & Attach. D (Nov. 26, 2019, Dec. 5, 2019 and Feb. 18, 2020 letters from H. Hagan to Lussi).

16.     Lussi appealed his expulsion and threatened legal action for the actions of GIC and the Club. *Id.* ¶ 20.

17.     Joseph Hennessy and Gwen Franco are the prior owners of Banbury. **Ex. 10** (J. Hennessy Dep.) at 11:11-12:14.

18.     By early October 2019, Lussi had begun making payments to Banbury's then-owners, Joseph Hennessy and Gwen Franco, for a right of first refusal to purchase the property for $6 million. **Ex. 11** (Oct. 1, 2019 Check); **Ex. 12** (Dec. 1, 2019 Check); **Ex. 13** (Jan. 1, 2020 Check); **Ex. 10** at 31:1-32:1 ("A: This was his first check or the check for the month when he said, 'I want an option to buy your house.'  I said, 'Okay.  I'll give you the first right of refusal.'  Q: Okay.  And those -- that began with a check on October 1, 2019? A: Yes, apparently.")

19.     In October 2019, Lussi also hired an architectural firm, which designed plans, and applied to Anne Arundel County for grading and building permits in Hennessy and Franco's names. **Ex. 14** (Oct. 22, 2019 Grading Permit Application); **Ex. 15** (Nov. 22, 2019 Building

Permit Application); **Ex. 16** (Dec. 17, 2019 Corrected Building Permit Application); **Ex. 17** (Jan. 10, 2020 Building Permit Application).

20.     The building permit application identified planned exterior renovations, including constructing accessible ramps with landings and parking, demolishing retaining walls and a concrete deck, removing solar panels, and repairing or replacing existing HVAC and power generator equipment. **Ex. 15**; **Ex. 17**; **Ex. 18** (Lussi Aff.) ¶ 19 & Attach. C (acknowledging exterior work and including site plan review report).

21.     Lussi "held talks with Anne Arundel County" in pursuit of his plans to develop 1753 Banbury as an assisted living facility. *See* **Ex. 2** at 5; **Ex. 8**; **Ex. 19**. (Dec. 12-13, 2019 Emails between C. Lussi and W. Willard).

22.     After submitting an initial building permit application and two revised applications to correct deficiencies, and after engaging in discussions with Anne Arundel County employees, Lussi obtained the building permit, which was issued in Hennessy and Franco's names. **Ex. 14**; **Ex. 15**; **Ex. 16**; **Ex. 17**; **Ex. 2**; **Ex. 18**; **Ex. 19**; **Ex. 21** (Jan. 16, 2020, Revised Building Permit).

23.     The Anne Arundel County building permit and permit review documents for Banbury indicated that the property would be converted from a single-family dwelling to a nine-bed "assisted living facility" or "group home" for "institutional (supervised)" use. **Ex. 21**; **Ex. 22** (Dec. 12, 2019 Permit Administrator Letter and Attachments).

24.     On January 20, 2020, GHGI and the Hennessy/Francos executed a contract of sale for 1753 Banbury for $6 million. **Ex. 23** (Contract of sale).

25.     On March 4, 2020, Lussi, through GHGI, purchased Banbury. **Ex. 2** at 6; **Ex. 18** at Attach. A (Deed of Banbury Property).

26.     Although Banbury had recently been listed for under $4 million, GHGI purchased the property for $6 million. **Ex. 10** at 21:7-22:1, 52:18-20.

27.     The Hennessy/Francos loaned $1.5 million to facilitate the sale. **Ex. 24** (HUD Settlement Statement).

28.     On behalf of GHGI, Lussi applied for and received a proposal for a business loan from the commercial lending department at Sandy Spring Bank. **Ex. 2** at 6; **Ex. 24**.

29.     In pursuit of the loan, Lussi "provided an appraiser [retained by Sandy Spring Bank] with a budget calculating projected income from rental revenue, and estimated expenses including 'salaries, food, advertising, website maintenance, entertainment, consultants, and uniforms.'" **Ex. 2** at 6.

30.     Sandy Spring Bank approved the requested loan, which included $4.5 million for the purchase price of Banbury. **Ex. 24**.

31.     According to the loan documents, Lussi and Plaintiffs seek to "carry on a business or commercial enterprise" by operating an assisted living facility at 1753 Banbury. **Ex. 2** at 6.

32.     The facility at Banbury would charge residents for housing and services. **Ex. 2** at 5; **Ex. 7**; **Ex. 18** ¶ 21.

33.     The facility at Banbury would require state licensure from the Maryland Department of Health-Office of Healthcare Quality. *See* COMAR 10.07.14.04; **Ex. 2** at 5, 12; **Ex. 22**; **Ex. 20** (Dec. 13, 2019 W. Willard Email & Revised Permit Application) (acknowledging licensure requirement).

34.     The facility at 1753 Banbury would hire and pay employees to supervise residents. **Ex. 2** at 5, 12; **Ex. 8**.

35.     The facility at Banbury would include a small parking lot with four spaces for staff and consumers. **Ex. 8**.

36.     The facility at Banbury would receive commercial deliveries of catered food and supplies. **Ex. 2** at 5, 12; **Ex. 15**; **Ex. 16**; **Ex. 17**.

37.     On March 4, 2020, Plaintiffs commenced construction of the facility at 1753 Banbury. **Ex. 2** at 6; **Ex. 18** ¶ 9.

38.     Plaintiffs proceeded with development of the facility without seeking GIC approval under the Deed Covenants either for the use of the property as a business or for making exterior renovations. **Ex. 2** at 6, 18; **Ex. 25** (Mar. 26, 2020 Letter from J. Daly to C. Lussi); **Ex. 18** ¶¶ 17, 19, 20; **Ex. 6** ¶ 14 & Attach. B (photos of demolition); *see also* ECF No. 2-1 at 10-11.

39.     GIC first observed construction at Banbury on March 25, 2020.  **Ex. 2** at 6; **Ex. 26** (Mar. 25, 2020 Letter from C. Roswell to C. Lussi).

40.     That day, seeking compliance with the Deed Covenants, GIC demanded that Lussi cease construction. **Ex. 2** at 6; **Ex. 26**.

41.     To enforce the Deed Covenants, Gibson Island's Special Police ("GI Police") tried to prevent construction personnel and equipment from entering onto the Island. **Ex. 27** (GI Police Chief C. Sperry Decl.) ¶¶ 2, 4. These efforts to obtain compliance with the Deed Covenants escalated when Lussi provoked an altercation at the gatehouse and then instructed contractors to go to Banbury in defiance of GI Police directives. *Id.* ¶ 6.

42.     Similar altercations between Lussi and GI Police transpired over the next several days, as Lussi circumvented security directives to continue with renovations. **Ex. 2** at 7; **Ex. 27** ¶¶ 5, 8-9. As part of his effort, Lussi summoned the Anne Arundel County Police and twice enlisted an off-duty Maryland State Police lieutenant to tell GI Police not to enforce the Island's

7

rules. *Id.* ¶¶ 10, 11; **Ex. 6** ¶ 15. After the second incident, the lieutenant's captain advised GIC President Jim Daly that the lieutenant had been off-duty, was not authorized to work for Lussi, and would no longer respond to Gibson Island. **Ex. 6** ¶ 15.

43.     On March 26, the day after learning of Lussi's work at 1753 Banbury, GIC President Daly wrote to Lussi advising that his efforts to establish and operate a commercial assisted living facility with exterior renovations without GIC approval violated the Deed Covenants. *Id.* ¶ 11 & Attach. A.  Daly indicated that GIC was open to any proposal that Lussi wished to submit for the facility and to engage in dialog with Lussi around a proposal. **Ex. 2** at 6; **Ex. 6** at Attach. A. GIC requested that Lussi produce details of his plans, assuring Lussi that GIC would give full, fair, and prompt consideration to any proposal. **Ex. 2** at 6-7; **Ex. 6** at Attach. A.

44.     Lussi never responded to Daly's letter and did not submit any proposal for approval. **Ex. 2** at 7; **Ex. 6** ¶ 13.

45.     After receiving Daly's letter, Lussi continued to transport construction personnel and equipment to Banbury in his own personal vehicle to proceed with renovations, including the exterior improvement work covered by the Deed Covenants' Architectural Review provisions, *i.e.,* work on the retaining walls, patio, solar paneling, parking lot, and HVAC and power generator equipment. **Ex. 2** at 7; **Ex. 6** ¶ 14 & Attach. B (photos of demolition and parking pad); **Ex. 27** ¶¶ 8, 10-12, 14; **Ex. 18** ¶¶ 9, 17.

46.     On March 27, 2020, Lussi had a contractor with a stake bed truck towing a small cement mixer inform GI Police that he was headed to Lussi's personal home, when in fact he was headed to Banbury. **Ex. 27** ¶ 10. Soon after the contractor was turned away, Lussi left the Island, returned with the contractor, left the Island again, returned driving the truck and mixer

himself, and, following a discussion involving the off-duty MSP lieutenant, was allowed through. *Id.*; **Ex. 2** at 7.

47.     On March 30, 2020, GIC filed a declaratory judgment action seeking a declaration that, consistent with the Deed Covenants and the reasonable accommodation provision of the FHA, if Lussi and GHGI wished to establish an assisted living facility at Banbury, they had to cease construction activity and first apply to GIC for approval for a business use and exterior renovations. No. 1:20-cv-00842-RDB, ECF No. 1; **Ex. 2** at 1.

48.     On April 3, 2020, Lussi told Chief Sperry he had purchased a $30,000 Bobcat that he intended to take to his personal residence. **Ex. 27** ¶ 13. Lussi then appeared at the gatehouse with a trailer loaded with a backhoe. *Id.* Lussi went straight to Banbury and had a contractor begin using the backhoe to tear down retaining walls. *Id.* In response to a complaint, GI Police came to the property and instructed Lussi to stop work, as it was past the 6:00 p.m. curfew established by Island rules. *Id.*; **Ex. 28** (Accommodations Committee Report) at Tab 11 (GIC013531) (rules governing contractors). The following morning, on April 4, 2020, despite the Island's prohibition on exterior work on weekends, *id.*, the backhoe operator resumed tearing down the retaining walls. **Ex. 27** ¶ 14. A GI Police officer instructed the operator to stop work because he was in violation of Island policy. *Id.* Lussi interceded, advised that the officer was trespassing, and refused to stop work. *Id.* Although the operator stopped momentarily, he resumed shortly after the officer left and continued work throughout the day. *Id.* By the end of the day, the retaining walls were demolished. *Id.*; **Ex. 6** at Attach. B.

49.     On April 3, 2020, Plaintiffs filed this action, and sought a preliminary injunction. *See* ECF Nos. 1 & 2. Plaintiffs alleged that GIC was engaging in intentional discrimination

based on the disabilities of Banbury's potential residents by seeking to prevent GHGI from establishing an assisted living facility without first applying to GIC for approval. *Id.*

50.     The Court consolidated the actions on April 17, 2020, and entertained simultaneous briefing on GIC's motion for summary judgment in GIC's case and GHGI's motion for preliminary injunction in this case. *See* No. 1:20-cv-00842-RDB, ECF No. 10.

51.     On May 28, 2020, after a lengthy hearing, the Court granted GIC's motion, entered a declaratory judgment in GIC's favor, and denied GHGI's motion. **Ex. 2**; No. 1:20-cv-00842-RDB, ECF Nos. 28 & 29; ECF No. 18; *see also* **Ex. 29** (May 28, 2020 Hearing Transcript).

52.     In granting GIC's motion, this Court found that GHGI and Lussi intended to operate a business at Banbury and sought to earn a profit. **Ex. 2** at 12 ("[I]t is clear as a matter of law that Defendants are starting a business on the Banbury property. The uncontested facts demonstrate that [GHGI] seeks to earn a profit, and that its facility will feature all the usual incidents of a commercial enterprise—it will employ full-time staff, receive catered deliveries, maintain business records, obtain state licensure, and advertise its services. In addition, Defendants consistently referred to their group home as a 'business' throughout their loan transactions with Sandy Spring Bank and warranted that their loan proceeds 'will be used to acquire or carry on a business or commercial enterprise.'").

53.     In granting GIC's motion, the Court determined that GHGI had to seek and obtain from GIC approval for both a business use and exterior renovations before recommencing construction at Banbury. *Id* at 9-13.

54.     In granting GIC's motion, the Court found that GIC's effort to enforce the Deed Covenants against GHGI and Lussi was not animated by an intent to discriminate against

individuals with disabilities and did not violate the Fair Housing Act. *Id.* at 14-16. In so finding, the Court held that GIC's 2016 rejection of Lussi's informal suggestion to purchase GIC property in 2016 was "four years" ago, and "this case features a separate transaction involving a different parcel, a different proposal, and different decisionmakers." *Id.* at 14-15. The Court further held that GIC's decision not to accept Lussi's formal offer in late 2019 to purchase GIC property at 430 Magothy Road "does not suffice" to show intentional discrimination: "The Corporation declined this offer on nondiscriminatory grounds, and Lussi offers no evidence that this rationale was pretextual." *Id.*

55.     In granting GIC's motion, the Court also found that GIC's request for GHGI and Lussi to explain the details of their proposal for Banbury did not violate the Fair Housing Act and was, in fact, consistent with the Act's reasonable accommodation provision. *Id.* at 15-18. In so finding, the Court determined that a home operated as a for-profit assisted living facility is not comparable to, and "totally distinguishable from," homes in which "homeowners routinely rent out their residence for a profit, employ household staff, hold catered events, and receive deliveries or medical care in their homes," and so allowing the latter without requiring homeowners to first apply for business use approval is not evidence of intentional discrimination in this case. *Id.* at 15-16; **Ex. 29** at 62 ("It is totally distinguishable from someone renting out a home for a period of time on Gibson Island as has been permitted and that is not the same in terms of the nature of the use of the property here.").

56.     In granting GIC's motion, the Court recognized that GHGI and Lussi had flouted the Deed Covenants:

> The Deed Covenants do not prohibit the establishment of an assisted-living group home for disabled seniors—they simply require providers to request a reasonable accommodation through the established review procedures. ***Instead of following these procedures and granting the Corporation an opportunity to provide an***

11

> *exception to its facially neutral rules, Group Home seeks to bypass these rules entirely and unilaterally proceed with its construction. The Fair Housing Act simply does not provide Group Home and Lussi a "blanket waiver" of facially neutral rules. Bryant Woods*, 124 F.3d at 603. Until an accommodation has been requested and denied—and absent any evidence that the Covenants have been applied to Defendants with a discriminatory motive—Group Home has failed to present a genuine issue of material fact suggesting that the Corporation has violated the Fair Housing Act.

**Ex. 2** at 18 (emphasis added); *see also* **Ex. 29** at 122 (this Court "cannot … ignore the fact that Mr. Lussi proceeded at his own peril early in the game with respect to many of these steps he took, summarily making the decision not to seek approval from the Corporation").

57.     GIC spent hundreds of hours and hundreds of thousands of dollars litigating Plaintiffs' motion for preliminary injunction and GIC's motion for summary judgment. **Ex. 30** (GIC 30(b)(6) Dep.) at 141:11-144:22.

58.     In early June 2020, pursuant to this Court's declaratory judgment in favor of GIC, Plaintiffs submitted two applications to GIC—the first on June 5 for approval of their planned exterior renovations at Banbury, the second on June 10 for approval to operate an assisted living facility for nine seniors at Banbury. **Ex. 31** (June 5, 2020 Request to Architectural Committee); **Ex. 32** (June 10, 2020 Reasonable Accommodation Request).

59.     GIC's Architectural Review Committee undertook consideration of the exterior renovations. **Ex. 33** (June 22, 2020 Architectural Committee Memo).

60.     On June 13, 2020, GIC's Architectural Review Committee ("ARC") met to consider the exterior renovations.

61.     On June 22, 2020, the ARC issued a memo regarding Plaintiffs' June 5, 2020 request for approval of exterior renovations at Banbury. *Id.*

62.     On June 26, 2020, the GIC Board voted to create a three-person Accommodations Committee to evaluate Plaintiffs' business use proposal for Banbury, the first

12

request for a business use GIC had ever received for a private home. **Ex. 34** (June 26, 2020 GIC Resolution); *see also* **Ex. 33** at 3.

63.    On July 10, consistent with its June 22 memo explaining its findings, **Ex. 33**, the ARC sent Plaintiffs a letter indicating several deficiencies with their request. **Ex. 35** (July 10, 2020 Letter from P. Jost to C. Lussi).

64.    In the meantime, on July 16, 2020, after several exchanges between counsel, the members of the Accommodations Committee were provided access to documents under a protective order so as to facilitate their consideration of Plaintiffs' business use proposal. **Ex. 36** (June 29, 2020 Email from C. Roswell and Previous Correspondence), **Ex. 37** (July 7, 2020 Email from S. Rosenthal and Previous Correspondence); **Ex. 38** (July 13, 2020 Email and Letter from G. Genth); **Ex. 39** (July 15, 2020 Email and Letter from C. Roswell).

65.    On July 21, 2020 counsel for the parties set a date of August 21 for an initial meeting between Lussi and members of his family and the Accommodations Committee. **Ex. 40** (July 21, 2020 Emails between C. Roswell and G. Genth).

66.    On August 20, 2020, at Lussi's request, counsel for GIC emailed Plaintiffs' counsel a list of discussion topics for the meeting with the Accommodations Committee. **Ex. 41** (Aug. 20, 2020 Emails between C. Roswell and G. Genth). Each side independently elected not to have counsel present at the meeting. *Id.*

67.    A meeting on Zoom between members of the Lussi family and the Accommodations Committee took place the next day, August 21, 2020. **Ex. 28** at Tab 5 (GIC014389).

68.     A week later, on August 28, 2020, Lussi provided the Accommodations Committee some of the documents the Accommodations Committee had requested at the August 21 meeting. *Id.* at Tab 10 (GIC013482).

69.     The same day, August 28, 2020, members of the Accommodations Committee toured Banbury with Lussi. *Id.* at GIC013460.

70.     On August 30, 2020, Lussi provided the Accommodations Committee information about planned food service at 1753 Banbury. *Id.* at Tab 1 (GIC014345).

71.     On September 12, 2020, Lussi emailed the Accommodations Committee twice— once to provide additional information, and again to offer to include GIC as a named insured on all insurance policies, among other things. *Id.* at Tab 9 (GIC014643), Tab 2 (GIC014376), respectively.

72.     On October 15, 2020, after Lussi addressed the deficiencies in the ARC's letter from July 10, 2020, the ARC issued a memo recommending approval of Plaintiffs' exterior renovations request. **Ex. 42** (Oct. 15, 2020 Architectural Committee Memo).

73.     On October 28, 2020, as the Accommodations Committee considered Lussi's materials and began writing its report, Lussi provided the Accommodations Committee a septic system report obtained from the Hennessy/Francos. **Ex. 28** at Tab 8 (GIC014640).

74.     At a meeting on October 29, 2020, upon the ARC's recommendation in its October 15, 2020 memo, the GIC Board approved Plaintiffs' exterior renovations request. **Ex. 43** (Nov. 2, 2020 Letter to C. Lussi with Oct. 15 Architectural Committee Memo).

75.     On November 2, 2020, GIC sent Lussi a letter informing him of its October 29, 2020 approval for exterior renovations at Banbury. *Id.*

14

76.     On December 11, 2020, after resolving their disagreements over confidentiality designations, the parties jointly filed a stipulation expanding the list of individuals who could view documents designated "confidential" to include all GIC Board members. *See* ECF Nos. 33-34.

77.     The same day—December 11—the Accommodations Committee submitted a detailed, 30-page report and recommendations to the GIC Board. **Ex. 28**. The report noted at the outset that the Lussis had "made a number of representations about their plans that are inconsistent with [their original June 10 proposal] and prior representations. They also at times furnished some information that was incomplete or non-responsive and thus required follow-up. As a result, and because of the behaviors described elsewhere in this Report, we cannot tell the Board that we are fully confident the Lussis have accurately described their plans. Nonetheless, we have tried to faithfully report their responses and representations." *Id.* at 1-2.

78.     The Accommodations Committee report provided the litigation context for the Accommodations Committee's work; described the investigation the Committee did; set forth fact findings regarding the planned ownership, management, and daily operation of the planned facility, as well as the facility's potential impact on Gibson Island's residential land use scheme; and specified "vague, unverifiable or inconsistent information from the Lussis." *Id.* at 1-26.

79.     The Accommodations Committee concluded that "the operation of a Lussi-operated assisted living facility as a business on Gibson Island will impose major administrative and financial burdens on the Corporation" because "based on Mr. Lussi's history of contentious, rule-breaking behavior and the vague, inconsistent or unverifiable representations the Lussis have made related to the Request, we believe that entering an accommodation agreement with

the Lussis will lead to frequent, time-consuming, and potentially expensive disputes initiated by Mr. Lussi, potentially including additional litigation." *Id.* at 26.

80.     Nevertheless, the Committee advised that, "[i]f the Board nonetheless believes an accommodation agreement is feasible, any agreement should contain the following recommended provisions, along with adequate guarantees of performance that would not require the Corporation to engage in extensive litigation with its counterparty(ies) to obtain compliance." *Id.* at 27.

81.     The Committee then set forth 19 recommendations for provisions that it said should be included so as to "limit the administrative and financial burdens to the Corporation, protect the residential character of the Island, and diminish any impact on the Island's environment and infrastructure. Consistent with the Fair Housing Act, none of these recommendations would impose on the facility restrictions that are greater than the restrictions imposed on other Island homes, except to the extent needed either to reduce the added administrative burdens the operation of the facility is likely to force on the Corporation or to mitigate the impact the facility could have on the Island's carefully maintained residential land use scheme." *Id.* at 27-30.

82.     GIC's Board met three times over the next three weeks—December 13 and 21, 2020, and January 5, 2021—to discuss the Accommodations Committee report and recommendations. **Ex. 44** (Cecala Decl.) ¶ 2.

83.     On January 5, 2021, the GIC Board adopted a resolution that authorized negotiations with Plaintiffs through the Lussi family and established a three-person Negotiations Committee. **Ex. 45** (Jan. 5, 2021 GIC Resolution).

16

84.     The resolution recounted Lussi's history of contentiousness, bullying and rule-breaking, as well as the work and findings of the Accommodations Committee, before concluding that GIC "is nevertheless willing to further engage in the 'interactive process' by exploring the possibility of entering into a negotiated accommodation agreement that would incorporate the recommendations in the Committee's December 11, 2020 report . . . ." *Id.*

85.     Following passage of the resolution, newly elected GIC President Guy Cecala sent an email to all shareholders informing them of the impending negotiations, reiterating GIC's commitment to non-discrimination, and attaching a copy of the resolution. **Ex. 46** (Jan. 8, 2021 G. Cecala Email to GIC Shareholders).

86.     The Negotiations Committee and the Lussi family exchanged emails to set a date for an initial meeting, identifying the Accommodation's Committee's recommendations as the springboard for the discussion. **Ex. 47** (Jan. 14-15, 2021 Emails Between L. Sarkes and Lussis); **Ex. 48** (Jan. 7 & 13, 2021 Emails Between L. Sarkes and Lussis).

87.     On January 19, 2021, the Negotiations Committee and members of the Lussi family met for several hours. *See* **Ex. 49** (Feb. 16, 2021 Email from L. Sarkes to Lussis).

88.     On January 20, 2021, Lussi followed up with an email with additional information. **Ex. 50** (Jan. 20, 2021 Email from Lussis to GIC Negotiations Committee).

89.     On January 24, Lussi sent another email. [1] Foreshadowing the numerous bullying, digressive communications to come, this email—far from setting the tone for constructive dialog—accused GIC of discrimination and charged a Committee member with

---

[1] Although this and other emails were signed by Lussi and his wife and three children, deposition testimony established that Lussi wrote the emails. **Ex. 52 (**J. Lussi Dep.) at 211:17-214:2.

endorsing statements that Lussi said violated the FHA (but in fact did not). **Ex. 51** (Jan. 24, 2021 Email from Lussis to GIC Negotiations Committee).

90.     Lussi's January 24, 2021 email also raised the 1991 "Carson settlement." *Id.* The Carson settlement provides fee-based access to the Gibson Island Club to GIC shareholders who do not join the Club, as well as all-shareholder access to leased GIC property apart from the GIC property leased to the Club, subject to certain terms, conditions and limitations set forth in the settlement agreement. **Ex. 44** ¶ 15. Lussi has obsessed over the Carson settlement ever since his expulsion from the Club in late November 2019. *Id.* ¶16.

91.     The Carson settlement was not relevant to discussions between the Negotiations Committee and the Lussis regarding the planned assisted living facility at 1753 Banbury. *Id.* ¶ 19. Any issues regarding Gibson Island Club membership or fee-based Club access for residents of the proposed facility are issues the potential residents would need to address with the Club. The Club, which is a separate entity from GIC, was not a party to any litigation, was not included in the negotiations regarding the Lussis' proposed facility, and would not have been a party to any final accommodation agreement. *Id.*

92.     On January 25, 2021, the Negotiations Committee sent the Lussis a draft Memorandum of Understanding ("MOU") containing proposed, material terms of an accommodation agreement. **Ex. 53** (Jan. 25, 2021 Email from GIC Negotiations Committee to Lussis). The terms largely reflected the Accommodations Committee's recommendations. *Id.*

93.     On February 2, 2021, rather than responding to the Negotiations Committee, Lussi sent a vituperative 12-page, single-spaced email directly to GIC President Cecala. **Ex. 54** (Feb. 2, 2021 Email from Lussis to G. Cecala). He attached a signed .pdf (not a Word document) of a final accommodation agreement, which ignored the Committee's request to show the

changes being made to its proposed MOU. In his email, Lussi alleged that every term of the proposed MOU was discriminatory (though agreeing in substance with most of them); re-litigated the matters this Court had already decided about his violation of the Deed Covenants; maintained he had a personal lifetime exemption from seeking approval from the ARC for exterior renovations; explained why Banbury would only follow "lawful" GIC rules—effectively arrogating to himself the authority to determine which rules to follow; repeated his allegations of GIC's purported history of disability discrimination and "public conspiracy" against him; and accused GIC of considering the Banbury proposal in bad faith. *Id.*

94. Cecala sent Lussi's package to the Negotiations Committee, which sent a measured response on February 9, 2021. Attaching a revised MOU, the Committee explained that it was accepting several of Lussi's proposed changes, indicated which changes it could not accept, identified areas for further discussion, and implored Lussi to engage in a conventional negotiation by focusing on the terms of an agreement, eliminating irrelevant issues and baseless allegations, and sending back a Word version of any counterproposal showing changes, rather a clean .pdf with a demand for immediate countersignatures. **Ex. 55** (Feb. 9, 2020 Email from GIC Negotiations Committee to Lussis).

95. The initial exchanges between January 25 and February 9, 2021 set a pattern for the following six weeks. GIC would send a proposal explaining the changes it was accepting and those it could not, and Lussi would respond with long, rambling, unfocused diatribes. These diatribes sought to bully GIC into acquiescence with heated accusations of discrimination, and obsessed over the Carson settlement and other irrelevancies. Altogether, this pattern repeated itself a number of times between January 25 and March 9. It included the following communications:

a)     February 13, 2021: six-page, single-spaced email from Lussi, attaching a signed "Accommodations Agreement." **Ex. 56** (Feb. 13, 2021 Email from Lussis to GIC Negotiations Committee); *id.* at GHGI-ALW005820 (signed Accommodation Agreement).

b)     February 14, 2021: email from the Negotiations Committee. **Ex. 57** (Feb. 14-15, 2021 Emails between GIC Negotiations Committee and Lussis).

c)     February 15, 2021: four-page, single-spaced email from Lussi. *Id.*

d)     February 16, 2021: email from the Negotiations Committee, attaching another copy of the MOU previously sent on February 9. **Ex. 58** (Feb. 16, 2021 Email from GIC Negotiations Committee to Lussis); *id.* at GHGI-ALW004202.

e)     February 17, 2021: four-page, single-spaced email from Lussi. **Ex. 59** (Feb. 17, 2021 Email from Lussis to GIC Negotiations Committee) (attaching a 36 page "form" styled as a questionnaire).

f)     February 17, 2021: email from the Negotiations Committee. **Ex. 60** (Feb. 17, 2021 Email from GIC Negotiations Committee to Lussis).

g)     February 18, 2021: four-page, single-spaced email from Lussi. **Ex. 61** (Feb. 18, 2021 Email from Lussis to GIC Negotiations Committee).

h)     February 22, 2021: email from Negotiations Committee, attaching an updated draft MOU. **Ex. 62** (Feb. 22, 2021 Email from GIC Negotiations Committee to Lussis).

i)     February 25, 2021: 10-page, single-spaced email from Lussi, attaching a "revised binding and signed MOU." **Ex. 63** (Feb. 25, 2021 Email from

Lussis to GIC Negotiations Committee); *see also id.* at GHGI-ALW005837; *id.* at GHGI-ALW005858.

j)    March 3, 2021: email from the Negotiations Committee, attaching a revised draft MOU. **Ex. 64** (Mar. 3, 2021 Email from GIC Negotiations Committee to Lussis).

k)    March 9, 2021: 20-page single-spaced email from Lussi, attaching a "binding" MOU. **Ex. 65** (Mar. 9, 2021 Email from Lussis to GIC Negotiations Committee); *id.* at GHGI-ALW004125.

96.    Amid these exchanges, the Negotiations Committee proposed, and the Lussis agreed to, a meeting on February 18 to discuss the parties' differences. **Ex. 53**; **Ex. 57**.

97.    The afternoon before the meeting, which was intended to amicably resolve outstanding issues, Lussi sent the Negotiations Committee another broadside. Attached to the email was a 29-page questionnaire seeking a separate, written justification for each provision of the proposed MOU as a pre-condition to the meeting. **Ex. 59**.

98.    The Committee responded the same day, emphasizing that:

> [T]he purpose of our ongoing discussions with you is not to score points and win arguments, but rather to try to *move past* our disagreements, to resolve the issues that separate us, and to avoid further litigation. We remain willing to do so—to relent on our firm position on administrative and financial burdens and to engage in substantive, meaningful discussions to resolve our differences with you. We obviously cannot force you to do the same. We can only ask. So we ask: if you are genuinely interested in opening a group home at 1753 Banbury, please stop trying to unilaterally dictate the terms of an agreement to us and settle old scores; instead, please engage in a respectful, non-accusatory dialog over the issues that separate us.

The Committee then identified the principal remaining points of disagreement to focus the discussion at the meeting. **Ex. 60**.

99.     The Committee's entreaty was unavailing. After the meeting, the pattern of a Committee offer, followed by a sprawling, incendiary reply, continued for the next three weeks, with exchanges from February 22 through March 9, 2021. *See supra*.

100.    On March 18, 2021, GIC President Cecala responded to Lussi on behalf of the GIC Board. **Ex. 66** (Mar. 18, 2021 Approval Email from G. Cecala to Lussi). He expressed frustration that Lussis' tactics had "negotiations . . . moving backwards not forward to completion of an MOU." *Id.* Accordingly, he sent the Lussis a new MOU reflecting GIC's best and final offer. In his email, Cecala expressly approved the establishment of an assisted living facility at 1753 Banbury: "the Board has decided that it will **approve** your proposed business use of 1753 Banbury upon your acceptance of the terms of the attached MOU." *Id.* Cecala also identified the few outstanding material points of disagreement that the MOU resolved. *Id.* Cecala concluded: "Upon your execution of the attached MOU without further revision, we will instruct our counsel to work with your counsel to draft an Accommodation Agreement." *Id.*

101.    On March 20, 2021, rather than accepting the approval, the Lussis rejected it, and Lussi reverted to form. **Ex. 67** (Mar. 20, 2021 Email from Lussis to G. Cecala/GIC Negotiations Committee). In another five-page single-spaced email, he responded with a tirade, recycling the same accusations of discrimination and the same irrelevant points about the Carson settlement. *Id.* He also introduced a new irrelevant subject: proposed revisions to the Deed Covenants that GIC was separately and unrelatedly considering at the time. *Id.*; *see also* **Ex. 44** ¶ 17. Lussi was opposing a number of the proposed revisions, which were irrelevant to the Lussis' proposed facility because the proposed facility was being considered under the business use provision of the then-existing Deed Covenants. **Ex. 44** ¶ 18. Lussi's March 20 rejection of

22

the GIC's approval of the Lussi's proposed facility included another MOU that was layered with references to the Carson Settlement and the proposed revisions to the Deed Covenants and reflected no compromise on the material points of disagreement Cecala had identified in his March 18 email. **Ex. 67** at GHGI-ALW003707.

102.    On March 26, 2021, Cecala replied and tried again. **Ex. 68** (Mar. 26, 2021 Approval Email from G. Cecala to Lussis). He repeated that GIC was approving the facility based on the MOU sent on March 18 and would not accept additional changes. *Id.* After again explaining why the Carson settlement was not germane, as well as the proposed Deed Covenants revisions, Cecala noted why each of the few disputed provisions Lussi kept changing were vital to "mitigating the administrative and financial burdens to [GIC]." *Id.* These provisions were as follows:

a)     **The Guarantor Provision,** which required guarantees from all entities and individuals who would be involved in the operation of Banbury and were associated with Lussi. Cecala noted that the Lussis had initially agreed to include all these entities and individuals until reneging. He explained that GIC needed this provision given Lussis' history of rule-breaking—"to guard against the situation in which an individual breaches or circumvents the agreement but is effectively unaccountable because they are without means and not all of the related entities or individuals have guaranteed the remedies for their non-compliance."

b)     **The Septic Provisions**, which required annual septic capacity certification and a septic monitoring plan. Cecala explained that these provisions were important because of the environmental sensitivity of Gibson Island, a land covenant providing that Banbury's owner may not expand the occupancy capacity of the residence beyond the criteria in the covenant (i.e., five bedrooms), *see* **Ex. 69** (1753 Banbury Septic Agreement with Anne Arundel County) and the proposed increase in occupancy to nine full-time residents (and bedrooms) and either two or three staff around the clock.

23

c)   **The Dispute Resolution Provision,** which Cecala explained had to include a notice-and-cure period of less than the 60 days Lussi demanded in order to resolve disputes promptly.

d)   **The Arbitration Escrow Condition,** which required each party to put $100,000 in escrow prior to any arbitration. Cecala explained that this provision was necessary at the outset to ensure the winning party was made whole and to disincentivize both sides from ginning up disputes and racing to expensive arbitration—a serious concern for GIC given that Lussi had forced GIC into costly litigation to enforce the Deed Covenants.

**Ex. 68**. Cecala ended the email by repeating that GIC "will approve your proposed business use of 1753 Banbury Road, subject to the execution of a final Accommodations Agreement, if you sign this proposed MOU *without alteration*." *Id.*

103.    On April 5, 2021, the Lussis again rejected GIC's approval. **Ex. 70** (Apr. 5, 2021 Email from Lussis to G. Cecala/GIC Negotiations Committee). Lussi sent GIC a large package, which included a rambling, 49-page, single-spaced screed that repeated and rehashed many of the same grievances Lussi had raised throughout the negotiation process, many of which had nothing to do with Banbury. *Id.* at GHGI-ALW005932.

104.    On April 15, 2021, recognizing the futility of further attempts to obtain the Lussis' agreement to its approval, GIC passed a resolution ending the process **Ex. 71 (**Apr. 15, 2021 GIC Resolution); **Ex. 30** at 239:6-20. The resolution explained that Lussi had twice rejected GIC's approval of 1753 Banbury; that Lussi's "history of contentiousness, rule-breaking and untrustworthiness . . . demonstrate that the Lussi family's operation of [Banbury] will impose undue administrative and financial burdens on the Corporation"; and that "the positions and actions taken by the Lussi family during the course of negotiations regarding an MOU . . . reinforce [this] conclusion." **Ex. 71**.

105.    The next day, April 16, 2021, Cecala sent the Lussis an email attaching and summarizing the resolution. **Ex. 72 (**Apr. 16, 2021 Email from G. Cecala to Lussis). He explained: "Based on your April 5 rejection of the Corporation's latest proposal, your earlier rejection of the same proposal (sent to you on March 18), your insistent focus on the irrelevant Carson Settlement and draft Deeds and Agreements, and your steadfast refusal to compromise on any of the remaining relevant points of contention, the Corporation Board has unanimously passed the attached resolution, which authorizes no further negotiations." *Id*. Cecala emphasized that without the provisions included in GIC's final MOU, "you would never stop spoiling for a fight, and the Corporation would have inadequate means to recoup the costs it would be required to incur." *Id.*

106.    GIC informed its shareholders of its decision the same day. **Ex. 73** (Apr. 16, 2021 Email from G. Cecala to GIC Shareholders).

107.    On April 28, 2021, Lussi sent a 12-page email to all GIC "Owners (Stockholders) and Occupants and Their Guests." **Ex. 74** (Apr. 28, 2021 Email from Lussis to GIC Shareholders). Explaining why the Lussis were recommencing litigation against GIC, the email rehashed many of the same points Lussi had raised in his exchanges with the Negotiation Committee from January 24 – April 5, 2021, including his historical grievances, his allegations of disability discrimination, the Carson settlement, and the proposed Deed Covenants revisions. *Id.*

108.    In the April 28 email, Lussi revealed that on April 12, 2021—after having rejected GIC's final MOU a week earlier in part because of the Septic Provisions—he engaged a specialist to confirm the adequacy of the septic system, as the Septic Provisions would have required. *Id.*

109.     On June 30, 2021, Plaintiffs filed their First Amended Complaint in this case. *See* ECF No. 47.

110.     In their Amended Complaint, Plaintiffs point to GIC's past approval of the use of property for a church, past allowances for the Gibson Island Club and its various amenities ("food and beverage," "a ten-room hotel," "a three-bedroom rental house," "sports activities," "youth camp," "yacht squadron," and "boat works"), a water treament plant, a post office, and GIC's Realty and Island Services offices. Am. Compl. ¶¶ 17, 90(i), 106.

111.     None of these facilities or operations are located or conducted in a private residential home. None resemble the business use of a private residential home, including the business use of a private residential home for family-like, congregate living for seniors in need of assistance with the activities of daily living. All were authorized decades ago. **Ex. 44** ¶ 14; *see also* **Ex. 2** at 3-4; **Ex. 6** ¶ 8 (stating GIC had neither received nor approved a request from a private homeowner to erect, maintain or use their home as a business on Gibson Island).

112.     When asked to state "all facts" supporting their disparate impact theory, Plaintiffs answered:

> In summary, GIC applies facially neutral rules and regulations in a way that affects Plaintiffs and their future residents differently than other properties that are homes and properties the GIC categorizes as businesses on Gibson Island that are allowed and encouraged. GIC employs the Deed Covenants the GIC admits it has no right to, Architectural Review rules, critical area regulations, septic and waste removal regulations, and new, evolving GIC restrictions on an assisted living group home use exclusively serving the disabled that are not imposed on the other existing homes with and without caregivers and or business uses not exclusively serving the disabled in a manner that negatively impacts Plaintiffs to a greater degree than other properties and property owners who have been and are operating a business use or whom the GIC determines are seeking a business use. Additionally, GIC applies these various standards under the guise of a case-by-case determination when the outcome has already been decided to disallow any group home contemplated by Plaintiffs. The delay inherent in applying these restrictions, as well as GIC's undue additional delay and refusal to engage in the interactive process, also disproportionately negatively affects Plaintiffs.

**Ex. 75** (Plaintiffs' Supplemental Responses to GIC's First Set of Interrogatories) at Interrog. 5.

113.     When asked to state "all facts" supporting their 42 U.S.C. § 3604(f)(2) claim,

Plaintiffs answered:

> In summary, GIC has expressly stated that it is against the concept of an assisted living group home since at least 2016 and has stated its willingness to act and has acted by any legal or extra-legal means necessary to prevent Plaintiffs' planned assisted living group home for the disabled from opening. GIC has done so in coordination with residents and non-residents. GIC has adopted and acted on statements reflective of animus toward elderly disabled individuals, particularly those living in a group home setting as opposed to their own individual homes, including but not limited to imposing waste removal requirements so materials with group home residents' bodily fluids on them are not collected and co-mingled with the larger community's trash

*Id*. at Interrog. 6.

114.     When asked to state "all facts" supporting their 42 U.S.C. § 3617 claim, Plaintiffs

answered:

> In summary, GIC has, in coordination with residents, non-residents, Club members and non-Club members, adopted and acted upon statements reflecting GIC's animus toward elderly disabled individuals and their caregivers, particularly those living in a group home settings as opposed to in individual homes, as well as launched and participated in an ad hominem campaign against Craig Lussi to portray him as the reason, as well as delaying and refusing to engage in the required interactive process both in and out of litigation amounting to a denial of reasonable accommodations, all of which has to date prevented elderly disabled residents from enjoying life on Gibson Island in a group home environment where each individual would be assisted with their daily needs of living and enjoy the daily group home comradery of other disabled, similar age residents.

*Id*. at Interrog. 9.

115.     While Plaintiffs have alleged that "GIC required all employees, agents, visitors,

invitees, or licensees of the Lussis and the residents to be 'accompanied' on the 2,800 feet of

HOA owned road from the Gibson Island gate to the group home and anywhere else on the

Island," Am. Compl. ¶ 90(m), GIC requires all guests of any shareholder to be accompanied or

otherwise supervised on GIC property. *See* **Ex. 76** (2021 Gibson Island Resident Handbook) at

33 ("Guests of shareholders may access Corporation properties…but ONLY when accompanied

by a shareholder."). And, the MOU GIC proposed specifically stated that visitors "do not need

to be accompanied as they drive directly to and from the Gatehouse to Banbury." *See* **Ex. 68** at GIC14698.

116.    Plaintiffs claim "GIC required $6 million of insurance," when in fact GIC initially came up with that figure because Lussi *offered* it, **Ex. 28** Tab 5 (GIC014389) (Aug. 21, 2020 meeting transcript); *see id.* at GIC014411-16, but then, on Lussi's request, reduced it to "the total amount of at least the one million dollars that Mr. Lussi has represented is his current coverage." *See* Am. Compl. ¶ 90(e); **Ex. 68** at GIC01496.

117.    Plaintiffs allege that "GIC required a separate list for gate house access to the group home's disabled residents, employees, agents, visitors, invitees or licenses to be provided to the General Manager of the HOA and Club," but the MOU provision does not apply to residents or their house guests and, for ease of access, would simply establish that, as with other regular visitors, the Gatehouse and manager maintain a list of "full- or part-time employees who will have Gatehouse access on a daily or otherwise regular basis" and that "individual service providers to be admitted upon receipt at the Gatehouse of a telephone message from [Plaintiffs'] manager." *See* Am. Compl. ¶ 90(k); **Ex. 68** at GIC014697.

118.    Other "conditions" that Plaintiffs allege in the Amended Complaint were never part of any proposed MOU or were resolved in the final proposed MOU. *Compare* Am. Compl. ¶¶ 90 (g), (l), (o), (t), & (u), *with* **Ex. 68** at GIC014695.

Respectfully Submitted,

/s/ Seth A. Rosenthal
Seth A. Rosenthal (Bar # 10780)
Katherine W. Morrone (Bar # 21810)
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
Tel: (202) 344-4000
Fax: (202) 344-4300

/s/ Craig D. Roswell
Craig D. Roswell (Bar # 09529)
NILES BARTON AND WILMER LLP
111 S. Calvert Street, Suite 1400
Baltimore, Maryland 21202
Tel: (410) 783-6300
Fax: (410) 783-6363
cdroswell@nilesbarton.com

sarosenthal@venable.com
kwmorrone@venable.com                    *Attorney for Gibson Island Corporation*

*Attorneys for Gibson Island Corporation*