**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| GROUP HOME ON GIBSON ISLAND, LLC, *et al.*, | ) ) ) | |
|  | ) | Civil Action No. 20-cv-00891-LKG |
| Plaintiffs, | ) ) | |
|  | ) | Dated:  November 16, 2023 |
| v. | ) | |
|  | ) | |
| GIBSON ISLAND CORPORATION, | ) | |
|  | ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

## I.     INTRODUCTION

In this civil action, Plaintiffs, Group Home on Gibson Island, LLC ("Group Home") and Assisted Living Well Compassionate Care 2, LLC ("ALW2"), allege that Defendant, Gibson Island Corporation ("GIC"), discriminated against prospective residents of an assisted living group home facility for disabled senior citizens upon the basis of disability, and retaliated against Plaintiffs, by denying their request to waive a restrictive covenant that prohibits single-family homes from being used for a "business purpose" as a reasonable accommodation to permit the operation of the group home on Gibson Island, Maryland, in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq.* and Maryland law, Md. Code Ann., State Gov't §§ 20-706 and 20-708.  *See generally*, ECF No. 47.   The parties have filed cross-motions for summary judgment, pursuant to Fed. R. Civ. P. 56, on the following issues: (1) whether GIC refused to grant Plaintiffs' June 2020 requests for a reasonable and necessary accommodation to operate their group home, in violation of Section 3604(f)(3)(B) of the FHA; (2) whether GIC intentionally made unavailable or denied housing because of disability, in violation of Section 3404(f)(1) of the FHA; (3) whether GIC intentionally discriminated in the terms, conditions, or privileges of the sale or rental of the property for the group home, or in the provision of services or facilities there, in violation of Section 3604(f)(2) of the FHA; (4) whether Plaintiffs have standing to bring their FHA retaliation claims; (5) whether Plaintiffs can prove their FHA

retaliation claims; (6) whether Plaintiffs can prove their FHA disparate impact and treatment claims; and (7) whether the Court should appoint a special master to conduct the "remedial stage" of finalizing an accommodation agreement. *See generally*, ECF Nos. 71-1 and 85-1.

In addition, Plaintiffs have moved for leave to file a second amended complaint. ECF No. 64. GIC opposes Plaintiffs' motion for leave to amend and, alternatively, seeks to strike certain allegations set forth in the proposed second amended complaint. ECF No. 73. GIC has also moved for leave to file a reply brief in support of its motion to strike. ECF No. 80.[1]

The motions are fully briefed. ECF Nos. 64, 71, 73, 77, 80, 85, 87, 88, 94, 95, 97, 104, 107 and 108. No hearing is necessary to resolve the motions. *See* Local Rule 105.6 (D. Md. 2023).

For the reasons that follow, the Court: (1) **GRANTS** GIC's motion for summary judgment; (2) **DENIES** Plaintiffs' cross-motion for partial summary judgment; (3) **DENIES** Plaintiffs' motion for leave to file a second amended complaint; (4) **DENIES-as-MOOT** GIC's motion to file a reply in support of its motion to strike certain allegations in Plaintiffs' proposed second amended complaint; and (5) **DISMISSES** the amended complaint.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.    Factual Background

Group Home and ALW2 allege in this fair housing act action that GIC discriminated against prospective residents of an assisted living group home facility for disabled senior citizens upon the basis of disability, and retaliated against Plaintiffs, by denying their request to waive a restrictive covenant that prohibits single-family homes from being used for a "business purpose" as a reasonable accommodation to permit the operation of the group home on Gibson Island, Maryland. *See generally*, ECF No. 47. Specifically, Plaintiffs allege that GIC discriminated against the prospective senior residents of the group home, by preventing Plaintiffs from

---

[1] The United States has filed a statement of interest in this case on the following issues: (1) whether GIC's proposed conditions are a reasonable accommodation and provide an equal housing opportunity; (2) whether certain conditions imposed by GIC constitute a constructive denial of Plaintiffs' reasonable accommodation request; and (3) whether GIC's septic condition is justified. ECF No. 94.

[2] The facts of this memorandum opinion are taken from the amended complaint, the parties' cross-motions for summary judgment, and the memoranda in support thereof. ECF Nos. 47, 64, 71, 73, 77, 80, 85, 87, 88, 94, 95, 97, 104, 107 and 108.

establishing a group home at 1753 Banbury Road on Gibson Island, Maryland (the "Banbury Property"). *See generally*, *id.*

Plaintiffs assert the following claims in the complaint: (1) unlawful discrimination and retaliation under the FHA, in violation of 42 U.S.C. §§ 3604 and 3617 and (2) unlawful discrimination under the Maryland Fair Housing Laws, Md. Code Ann., State Gov't 20-706 and 20-708 (Count II). ECF No. 47 at ¶¶ 168-81. As relief, Plaintiffs seek certain declaratory relief and to recover compensatory and punitive damages from GIC. *Id.* at Prayer for Relief.

<u>The Parties</u>

Plaintiff Group Home is a Maryland limited liability company owned and established by its managing member, Craig Lussi, to provide group home real estate activities. *Id.* at ¶¶ 15-16; ECF No. 65-2 at ¶¶ 10-11; ECF No. 71-9.

Plaintiff ALW2 is a Maryland limited liability company established by Mr. Lussi, and operated by Jeannette Lussi and other members of the Lussi family, to manage the day-to-day operations of the planned group home on Gibson Island. ECF No. 47 at ¶ 16; ECF No. 65-2 at ¶¶ 12-13; ECF No. 71-11.

Defendant GIC is a Maryland corporation that administers the private community of Gibson Island, Maryland and holds title to all the property on the island. ECF No. 47 at ¶ 17.

<u>The Restrictive Covenants</u>

As background, Gibson Island, Maryland contains more than 200 residential lots which are encumbered by restrictive covenants that have run with the land since the early twentieth century (the "Restrictive Covenants"). ECF No. 65-2 at ¶¶ 1-2; ECF No. 71-1 at 3; *see* ECF No. 71-3, Deed and Agreement; ECF No. 85-1 at 5-6. Gibson Island property owners are shareholders of GIC and they have right of access to the island, its roadways and its public facilities. ECF No. 47 at ¶ 17; ECF No. 85-1 at 6.

There are two Restrictive Covenants that encumber property on the island that are relevant to this dispute. First, Subdivision III of the Restrictive Covenants (the "Business Purpose Covenant") requires that island homes be used for private residential purposes only, unless GIC gives prior approval for use for business purposes. ECF No. 71-1 at 3; ECF No. 65-2

3

at ¶ 3; *see* ECF No. 71-3 at 6-7.  The "Business Purpose Covenant provides, in relevant part, that:

> [B]uildings may [only] be erected, maintained or used for business purposes in such locations as may be approved by the Company, provided, however, that no building shall be erected, maintained or used for any of the said purposes except by the Company, unless in each case there shall have been filed in the proper office of record a deed or other instrument in writing executed by the Company approving, specifying and limiting the uses to which such building may be put or the business which may be conducted therein.

ECF No. 71-3 at 7.

Second, Subdivision VII of the Deed Covenants (the "Exterior Alterations Covenant") prohibits exterior improvements to island homes without prior GIC review and approval.  *See id.* at 9; ECF No. 71-1 at 3; ECF No. 65-2 at ¶ 4.  The Exterior Alterations Covenant provides, in relevant part, that:

> No building, fence, wall, drainage or sewerage system or other structure shall be commenced, erected or maintained on said tract, nor shall any addition to or change or alteration therein be made, until the plans and specifications, showing the nature, kind, shape, height, materials, floor plans, color scheme, location, and approximate cost of such structure and the grading plan of the plot to be built upon shall have been submitted to and approved in writing by the Company and a copy thereof, as finally approved, lodged permanently with the Company.  The Company shall have the right to refuse to approve any such plans or specifications or grading plan, as are not suitable or desirable, in its opinion, for aesthetic or other reasons, and in so passing upon such plans, specifications and grading plan, it shall have the right to take into consideration the suitability of the proposed building or other structure and of the materials of which it is to be built to the site upon which it is proposed to erect the same, the harmony thereof with the surroundings and the effect of the building or other structure, as planned and located, on the outlook from the adjacent or neighboring property.

ECF No. 71-3 at 9.  GIC has delegated oversight of the exterior alterations approval process to an Architectural Review Committee ("ARC"), which enforces compliance with the Restrictive Covenants.  ECF No. 65-2 at ¶¶ 5-7; ECF No. 71-1 at 3; *see* ECF No. 71-5, GIC Architectural Guidelines and Committee Procedures at 1; ECF No. 71-6, Jost Decl. at ¶¶ 6-8, 28.

<u>The Acquisition Of The Banbury Property</u>

In the Fall of 2019, Mr. Lussi made plans to purchase the Banbury Property for use as a state-licensed group home for nine elderly disabled individuals who need assistance with daily activities.  ECF No. 47 at ¶ 2; ECF No. 65-2 at ¶¶ 18-23; ECF No. 71-1 at 4.  Mr. Lussi ultimately reached an agreement with the Banbury Property's then-owners, Joseph Hennessy and Gwen Franco, to purchase the Banbury Property for $6 million.   ECF No. 65-2 at ¶¶ 17-18; ECF No. 71-1 at 4.

During October and November of 2019, Mr. Lussi hired an architectural firm to draw up plans and to apply to Anne Arundel County for grading and building permits to convert the Banbury Property into an assisted living facility.  ECF No. 65-2 at ¶¶ 19-23; ECF Nos. 71-17, 71-18 and 71-19; ECF No. 71-20, Lussi Aff. at ¶ 5.  The permit applications requested permission for various renovations necessary to achieve Americans with Disabilities Act compliance, including constructing accessible ramps with landings and parking, demolishing retaining walls and a concrete deck, removing solar panels, and repairing or replacing existing HVAC and power generator equipment, all of which GIC maintains required prior ARC approval.  ECF No. 65-2 at ¶¶ 20, 22; ECF No. 71-20, Lussi Aff. at ¶ 5.

On January 16, 2020, Mr. Lussi obtained the building permit from Anne Arundel County to begin work.  ECF No. 65-2 at ¶ 22; *see* ECF No. 71-20, Lussi Aff. at Ex. C; ECF No. 71-23.  The Anne Arundel County building permit and permit review documents indicate that the Banbury Property would be converted from a single-family dwelling into a nine-bed "assisted living facility" or "group home" for "institutional (supervised)" use.  ECF No. 65-2 at ¶ 23; *see* ECF No. 71-23, Ex. 21; ECF No. 71-24, Ex. 22.

On January 20, 2020, Group Home and Mr. Hennessy and Ms. Franco executed a contract of sale for the Banbury Property.  ECF No. 65-2 at ¶ 24; *see* ECF No. 71-25.  And so, on March 4, 2020, Mr. Lussi, through Group Home, purchased the Banbury Property.  ECF No. 65-2 at ¶ 25.

It is undisputed that Group Home began construction on the Banbury Property on March 4, 2020, without first submitting a proposal to the ARC for approval under the Restrictive Covenants.  *Id.* at ¶¶ 37-38; s*ee* No. 1:20-cv-842-RDB, ECF No. 30 at 6; ECF No. 71-1 at 5.  On March 26, 2020, GIC's President, Jim Daly, sent a letter to Mr. Lussi advising that the efforts to

establish and operate a commercial assisted living facility with exterior renovations without ARC approval violated the Restrictive Covenants.  ECF No. 65-2 at ¶ 43; ECF No. 71-8, Daly Decl. at ¶ 11 and Attach. A.  It is undisputed that Mr. Lussi did not respond to Mr. Daly's letter and that construction on the Banbury Property continued.  *See* ECF No. 65-2 at ¶¶ 44-46.

<u>The Parties' Prior Litigation</u>

On March 31, 2020, GIC filed a declaratory judgment action in this Court requesting that the Court find that Mr. Lussi is required to request prior approval from GIC to use of the Banbury Property for business purposes and to make exterior alteration to the property.  *See* No. 1:20-cv-842-RDB, ECF No. 1.  On April 3, 2020, Group Home filed this action seeking, among other things, to enjoin GIC from enforcing the Restrictive Covenants, upon the grounds that GIC was engaging in intentional discrimination based upon disability related to the approval of the group home.  *See* ECF Nos. 1, 2.  The Court, subsequently, consolidated the two cases on April 16, 2020.  *See* ECF No. 13; No. 1:20-cv-842-RDB, ECF No. 10.  On May 28, 2020, the Court granted summary judgment in favor of GIC on certain issues, entered a declaratory judgment and denied Plaintiffs' motion for a preliminary injunction.  *See* ECF No. 18; No. 1:20-cv-842-RDB, ECF No. 30.

<u>Plaintiffs' Request For FHA Accommodation</u>

On June 5, 2020, Plaintiffs submitted a request to the GIC's ARC for approval of exterior renovations to the Banbury Property.  ECF No. 65 at ¶ 58; ECF No. 71-33.  On June 10, 2020, Plaintiffs submitted a request for GIC to waive the Business Purpose Covenant as a reasonable accommodation to allow them to develop the Banbury Property as a state-licensed assisted living group home for nine seniors with disabilities.  ECF No. 65-2 at ¶ 58; ECF No. 71-34; ECF No. 85-39.

Plaintiffs state in the request that they have "a long history of providing (and mobilizing) care for seniors with disabilities throughout Anne Arundel County, including on behalf of a number of notable Gibson Island families."  ECF No. 71-34; ECF No. 85-38 at 1.  Plaintiffs also state that they maintain an "interest list" of seniors "who would choose to live at the [home] once it is operational."  *Id.* at 2.  In addition, Plaintiffs' request states that all residents at the Banbury Property would be persons with disabilities by virtue of their eligibility for assisted living under State law.  *Id.* at 3.

6

Plaintiffs' request also provides details about the number of expected employees, traffic, parking, and emergency services utilized at the Banbury Property. *Id.* at 4-5. Lastly, Plaintiffs' request states that their requested accommodation is necessary because, "without it, seniors with disabilities, who need assistance with activities of daily living and wish to receive them in a group home setting, would have no equal opportunity to use and enjoy 'housing of their choice' on Gibson Island.'" *Id.* at 4.

The March 26, 2021, Memorandum Of Understanding

On June 26, 2020, GIC's Board of Directors (the "Board") voted to create a three-person Accommodations Committee to evaluate the proposal to use the Banbury Property for business purposes. ECF No. 65-2 at ¶ 62. To that end, the Accommodations Committee submitted a 30-page report and recommendations to the Board on December 11, 2020, which, among other things, provided the litigation context for the Accommodations Committee's work; described the Accommodations Committee's investigation; set forth fact findings regarding the planned ownership, management, and daily operation of the Banbury Property, as well as the facility's potential impact on Gibson Island's residential land use scheme; and detailed so-called "vague, unverifiable or inconsistent information from the Lussis." *Id.* at ¶¶ 77-81; ECF No. 71-30 at 24. Notably, the Accommodations Committee also provided 19 recommendations for items to include in an accommodations agreement, "consistent with the FHA," to "limit the administrative and financial burdens to GIC, protect the residential character of the Island, and diminish any impact on the Island's environment and infrastructure." ECF No. 65-2 at ¶ 81; ECF No. 71-30 at 26.

On January 5, 2021, the Board adopted a resolution that authorized negotiations with Mr. Lussi and established a three-person Negotiations Committee. ECF No. 65-2 at ¶ 83; ECF No. 71-47. The resolution states that GIC is "willing to further engage in the 'interactive process' referenced in the Joint Statement by exploring the possibility of entering into a negotiated accommodation agreement that would incorporate the recommendations in the Committee's December 11, 2020 report[.]" ECF No. 65-2 at ¶ 84; ECF No. 71-47 at 7.

On January 25, 2021, GIC sent Plaintiffs a proposed Memorandum of Understanding containing the proposed, material terms of an accommodation agreement. ECF No. 65-2 at ¶ 92; ECF No. 71-55. On March 18, 2021, following negotiations with Plaintiffs, GIC revised the

conditions in the MOU and informed Plaintiffs that GIC would approve Plaintiffs' reasonable accommodation request "upon your acceptance of the attached MOU."  ECF No. 65-2 at ¶ 100; ECF No. 71-68.

On March 26, 2021, GIC sent Plaintiffs a revised, final MOU (the "March 26, 2021, MOU").  ECF No. 65-2 at ¶ 102; ECF No. 71-70.  The March 26, 2021, MOU contains four conditions, which are in dispute in this case, namely, a guarantor provision; a dispute resolution provision; an arbitration escrow provision; and a septic provision.  *See* ECF No. 71-70; *see also* ECF No. 47 at ¶ 1 (confirming that "only four substantive restrictions remained under discussion").

First, the March 26, 2021, MOU requires guarantees from all entities and individuals who would be associated with the Banbury Property and its operator (the "Guarantor Provision").  ECF No. 71-70 at 1, 2.  Second, the March 26, 2021, MOU requires a notice-and-cure period of less than 60 days in order to resolve disputes promptly (the "Dispute Resolution Provision").  *Id.*

Third, Sections 7 and 9 of the March 26, 2021, MOU address the septic system for the Banbury Property (the "Septic Provision") and provide that:

> In addition, prior to any on-site preparation of meals for its residents, ALWII shall provide to the Corporation (1) a certification of a competent hydrological engineering firm as to the adequacy of the septic system to accommodate the full residency and staffing of the Facility and (2) a plan to monitor and evaluate the current and future impacts of discharges from the Facility and property to the property of neighbors or the Corporation in the event that evidence of such discharges appears. ALWII further will be required, if discharges are observed, to implement the approved plan and take appropriate steps to eliminate the discharges in a timely manner, and to bear the full cost of remediation.
>
> [. . .]
>
> ALWII is required to provide Septic Certification to the Corporation annually, beginning one year after the Facility is occupied, unless the Corporation waives the requirement, and to take necessary and appropriate remedial measures in the event that the system is not working properly or out of compliance with Federal, State, or local environmental regulations. Such Septic Certification shall be prepared by a competent environmental engineering firm, the cost of which will be borne by ALWII. Moreover, ALWII shall install a meter that creates daily monitoring reports measuring effluent at less than 900gpd flowing to the tank. Those reports shall be

maintained and made available to the Corporation upon request. If the 900gpd flow rate is exceeded for more than three consecutive days, ALWII shall take steps to achieve a reduction in that rate and return the rate to compliance.

ECF No. 71-70 at 7-8.

Lastly, Section 21 of the March 26, 2021, MOU requires that any future claims with respect to Plaintiffs' reasonable accommodation be "subject to mandatory and binding arbitration," including a requirement that each side deposit $100,000 in escrow to cover any future award of attorneys' fees and damages (the "Arbitration Escrow Provision"). *Id.* at 5-6. Plaintiffs did not agree to the aforementioned conditions. ECF No. 65-2 at ¶¶ 103, 104; ECF No. 85-1 at 25-26. And so, a final agreement between GIC and Plaintiffs was not reached.

On April 15, 2021, the Board passed a resolution ending discussions with Plaintiffs based on the futility of further attempts to obtain an accommodation agreement. ECF No. 65-2 at ¶ 104; ECF No 71-73.

Plaintiffs commenced this action on April 30, 2020. ECF No. 1.

**B.   Procedural History**

Plaintiffs commenced this fair housing act action on April 3, 2020. ECF No. 1. After the Court denied Plaintiffs' motion for a preliminary injunction (ECF No. 18), Plaintiffs filed an amended complaint on July 31, 2021. ECF No. 47.

On July 15, 2021, GIC answered the amended complaint. ECF No. 48. On July 26, 2022, Plaintiffs filed a motion for leave to file a second amended complaint. ECF No. 64. On August 17, 2022, GIC filed a motion for summary judgment. ECF No. 71.

On August 22, 2022, GIC filed a response in opposition to Plaintiffs' motion for leave to file a second amended complaint, or in the alternative, a motion to strike allegations concerning the parties' settlement communications. ECF No. 73. Plaintiffs filed a reply in support of their motion for leave to file a second amended complaint on September 2, 2022. ECF No. 77. On September 9, 2022, GIC filed a motion for leave to file a reply in support of its motion to strike. ECF No. 80.

On October 11, 2022, Plaintiffs filed a response in opposition to GIC's motion for summary judgment and a cross-motion for partial summary judgment. ECF No. 85. GIC filed a reply in support of its motion for summary judgment, and a response in opposition to

Plaintiffs' cross-motion for partial summary judgment, on November 16, 2022.  ECF No. 88.

On November 23, 2022, the United States filed a statement of interest.  ECF No. 94.  On December 5, 2022, GIC filed a response to the United States' statement of interest.  ECF No. 95.  On December 19, 2022, Plaintiffs filed an omnibus reply.  ECF No. 97.

On June 14, 2023, the Court issued an Order requiring the parties to file supplemental briefing regarding whether the proposed Septic Provision is discriminatory under the FHA.  ECF No. 102.  Plaintiffs filed a supplemental brief on July 10, 2023.  ECF No. 104.  On July 25, 2023, GIC filed a supplemental responsive brief.  ECF No. 107.  On August 8, 2023, Plaintiffs filed a supplemental reply brief.  ECF No. 108.

These motions having been fully briefed, the Court resolves the pending motions.

## III.   LEGAL STANDARDS

### A.   Fed. R. Civ. P. 56

A motion for summary judgment filed pursuant to Fed. R. Civ. P. 56 will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  And so, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co., Inc. v. Cameo Props*., 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co., Ltd*., 601 F.2d 139, 141 (4th Cir. 1979).

When ruling on a motion for summary judgment, the Court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co*., 773 F.2d 592, 595 (4th Cir. 1985).  In this regard, the moving party bears the burden of showing that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Catawba Indian Tribe of S.C. v. State of S.C.*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).  But a party who bears the burden of proof on a particular claim must also factually support each element of his or her claim.  *See Celotex Corp*., 477 U.S. at 322-23.  Given this, "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *Id*. at 323.  And so, on those issues on which the

nonmoving party will have the burden of proof, it is the nonmoving party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256.

The United States Court of Appeals for the Fourth Circuit has held that, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment."  *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir. 1997).  And so, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (internal citations omitted).  In addition, when faced with cross-motions for summary judgment, the Court must review each motion separately on its own merits "to determine whether either of the parties deserves judgment as a matter of law."  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n. 4 (1st Cir.1997) (citation and internal punctuation omitted).

### B.    FHA Claims

The FHA makes it unlawful to "make unavailable or deny, a dwelling to any buyer or renter because of a handicap," or to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of a handicap of that person."  42 U.S.C. § 3604(f)(1), (2).  The FHA defines a handicap as "a physical or mental impairment which substantially limits one or more of such person's major life activities," "a record of having such an impairment," or "being regarded as having such an impairment."  *Id.* § 3602(h).  Discrimination under the FHA includes the "refusal to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be needed to afford such person equal opportunity to use and enjoy a dwelling."  *Id.* § 3604(f)(3)(B); *see also Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 272 (4th Cir. 2013); *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 603 (4th Cir. 1997).

There are two methods for proving discrimination under the FHA: "either through direct evidence of discrimination or through the *McDonnell Douglas* burden-shifting framework."  *Martin v. Brondum*, 535 F. App'x 242, 244 (4th Cir. 2013) (citation omitted).  Direct evidence "encompasses conduct or statements that both (1) reflect directly the alleged discriminatory

11

attitude, and (2) bear directly on the contested [housing] decision." *Letke v. Wells Fargo Home Mortg., Inc.*, No. RDB-12-3799, 2013 WL 6207836, at *3 (D. Md. Nov. 27, 2013) (citation omitted). If the plaintiff "ha[s] not shown direct evidence of discrimination, they must proceed under the *McDonnell Douglas* burden-shifting framework." *Martin*, 535 F. App'x at 244.

Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. *McDonnnell Douglas Corp. v. Green*, 411 U.S. 792, 802. To prove a claim of disability discrimination under section 3604(f) of the FHA, a plaintiff must prove: (1) that he is handicapped and (2) that he was either discriminated against because of his handicap or denied a reasonable accommodation necessary to allow him the same use and enjoyment of his dwelling as other non-handicapped persons. *See Roberson v. Graziano*, No. CIV.WDQ-09-3038, 2010 WL 2106466, at *2 (D. Md. May 21, 2010), *aff'd*, 411 F. App'x 583 (4th Cir. 2011). The Fourth Circuit has held that, to prevail on a FHA discrimination claim based upon denial of a reasonable accommodation, a plaintiff must also show that "the proposed accommodation is (1) reasonable and (2) necessary (3) to afford handicapped persons equal opportunity to use and enjoy housing." *Scoggins*, 718 F.3d at 272 (citation and internal quotation marks omitted); *see also Bryant Woods Inn*, 124 F.3d at 603–04 (citing 42 U.S.C. § 3604(f)(3)). When determining whether a particular accommodation is reasonable, the Court should undertake a fact-specific inquiry that may include considering: (1) the extent to which the accommodation would undermine the legitimate purposes and effects of existing zoning regulations; (2) the benefits that the accommodation would provide to the handicapped; and (3) whether alternatives exist to accomplish the benefits more efficiently. *Bryant Woods Inn*, 124 F.3d at 604; *see also Scoggins*, 718 F.3d at 272; Joint Statement of the Dep't of Hous. & Urban Dev. and the Dep't of Justice, *Reasonable Accommodations Under the Fair Housing Act* 7 (2004)). "[I]n measuring the effects of an accommodation, the court may look not only to its functional and administrative aspects, but also to its costs." *Bryant Woods Inn*, 124 F.3d at 604.

An accommodation is not reasonable if it "impose[s] undue financial and administrative burdens or changes, adjustments, or modifications to existing programs that would be substantial, or that would constitute fundamental alterations in the nature of the program." *Id.*

(citations omitted).[3]  But courts have recognized that, even when a requested accommodation is reasonable, a defendant may offer an "alternative accommodation that would be equally effective in meeting the individual's disability-related needs."  *Sabal Palm Condos. of Pine Isl. Ridge Ass'n v. Fischer*, 6 F. Supp. 3d 1272, 1283 (S.D. Fla. 2014) (quoting Joint Statement of the Dep't of Hous. & Urban Dev. and the Dep't of Justice, *Reasonable Accommodations Under the Fair Housing Act* 8 (2004)).

An accommodation is "necessary" under the FHA, if there is a "direct linkage between the proposed accommodation and the equal opportunity to be provided to the handicapped person." *Bryant Woods Inn*, 124 F.3d at 604 (internal quotation marks omitted).  Lastly, the Fourth Circuit has recognized that the FHA's requirement that a defendant "afford handicapped persons equal opportunity to use and enjoy housing" does "not require accommodations that increase a benefit to a handicapped person above that provided to a non-handicapped person with respect to matters unrelated to the handicap." *Id.*

The FHA also prohibits retaliation for certain protected activities and the statute provides that:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

42 U.S.C. § 3617.  The protected activities covered by this provision include requesting a reasonable accommodation for a disability.  *See* 42 U.S.C. § 3604(f).  To prove a claim for retaliation under the FHA, a plaintiff must establish that: (1) the plaintiff was "engaged in protected activity;" (2) the Defendant "was aware of that activity;" (3) the defendant "took adverse action against the plaintiff; "and (4) a causal connection existed between the protected activity and the asserted adverse action." *Hall v. Greystar Mgmt. Servs., L.P.*, 637 F. App'x 93, 98 (4th Cir. 2016).

---

[3] The Fourth Circuit in *Scoggins* recognizes an additional factor of considering the "potential for personal injury… in examining whether a modification or accommodation request was reasonable." *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 273 (4th Cir. 2013).

### C.     Fed. R. Civ. P. 15 and 53

Lastly, Fed. R. Civ. P. 15(a)(2) provides that, when a party cannot amend a pleading by right, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). The decision of whether to grant or deny leave to amend is within the discretion of the Court, and the Court "should freely" grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). But, the Court should deny a party leave to amend "when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986) (citing *Foman*, 371 U.S. at 182); *see also Macsherry v. Sparrows Point, LLC*, No. CV ELH-15-22, 2016 WL 8669914, at *8 (D. Md. Oct. 28, 2016) (quoting *Booth v. Maryland*, 337 F. App'x 301, 312 (4th Cir. 2009) (per curiam) (A district court may deny a motion to amend for reasons "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment or futility of the amendment.") (internal quotes and citation omitted).

The Fourth Circuit has explained that "[w]hether an amendment is prejudicial will often be determined by the nature of the amendment and its timing . . . [T]he further the case progressed before judgment was entered, the more likely it is that the amendment will prejudice the defendant[.]'" *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 439 (4th Cir. 2011) (quoting *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006)) (cleaned up). To be sure, "prejudice can result where a proposed amendment raises a new legal theory that would require the gathering and analysis of facts not already considered by the opposing party, but that basis for a finding of prejudice essentially applies where the amendment is offered shortly before or during trial." *Johnson*, 785 F.2d at 510. In contrast, generally "[a]n amendment is not prejudicial . . . if it merely adds an additional theory of recovery to the facts *already pled* and is offered before any discovery has occurred." *Laber*, 438 F.3d at 427 (emphasis added).

Rule 53 of the Federal Rules of Civil Procedure authorizes the Court to appoint a special master and provides, in relevant part, that:

(a) Appointment.

    (1) *Scope.* Unless a statute provides otherwise, a court may appoint a
        master only to:

      (A) perform duties consented to by the parties;

      (B) hold trial proceedings and make or recommend findings of fact
          on issues to be decided without a jury if appointment is
          warranted by:
          (i)      some exceptional condition; or
          (ii)     the need to perform an accounting or resolve a difficult
                computation of damages; or

      (C) address pretrial and posttrial matters that cannot be effectively
          and timely addressed by an available district judge or magistrate
          judge of the district.

Fed. R. Civ. P. 53 (a)(1)(C).

## VI.    ANALYSIS

The parties have filed cross-motions for summary judgment, pursuant to Fed. R. Civ. P.
56, on the following seven issues: (1) whether GIC refused to grant Plaintiffs' June 2020
requests for a reasonable and necessary accommodation to operate their group home, in violation
of Section 3604(f)(3)(B) of the FHA; (2) whether GIC intentionally made unavailable or denied
housing because of disability, in violation of Section 3404(f)(1) of the FHA; (3) whether GIC
intentionally discriminated in the terms, conditions, or privileges of the sale or rental of the
property for the group home, or in the provision of services or facilities there, in violation of
Section 3604(f)(2) of the FHA; (4) whether Plaintiffs have standing to bring their FHA
retaliation claims; (5) whether Plaintiffs can prove their FHA retaliation claims; (6) whether
Plaintiffs can prove their FHA disparate impact and treatment claims; and (7) whether the Court
should appoint a special master to conduct the "remedial stage" of finalizing an accommodation
agreement. *See generally*, ECF Nos. 71-1 and 85-1.

In this regard, GIC argues that the undisputed material facts in this case show that
Plaintiffs cannot prevail on their FHA discrimination claims, because Plaintiffs advance no
evidence to show that their proposal was "necessary," because the proposal would not have
provided more therapeutic benefits to the Banbury Property's disabled residents.  ECF No. 71-1
at 20-25.  GIC also argues that Plaintiffs cannot prevail on their FHA discrimination and
retaliation claims, because: (1) Plaintiffs do not present any evidence to dispute that GIC twice

approved an assisted living facility located at the Banbury Property; (2) Plaintiffs' claim that GIC discriminated in the terms, conditions, or privileges of the sale or rental of the property for the group home, or in the provision of services or facilities there, fails, because the March 26, 2021, MOU does not implicate the terms, conditions, or privileges of the sale of the Banbury Property, the rental of rooms, or the provision of any GIC services or facilities to the Banbury Property; (3) Plaintiffs' disparate impact and disparate treatment claims similarly fail, because Plaintiffs cannot establish the neutral application of a rule with a disparate impact on individuals with disabilities, as compared to individuals without disabilities; and (4) Plaintiffs' retaliation claims fail, because Plaintiffs lack standing to bring these claims and Plaintiffs can neither show an adverse action on the part of the GIC, nor establish a causal connection between the alleged adverse action and any FHA protected activity. *See generally*, ECF No. 71-1. And so, GIC requests that the Court enter judgment summarily in its favor on Plaintiffs' FHA discrimination and retaliation claims. *Id.* at 37-38.

Plaintiffs counter that summary judgment in GIC's favor is not warranted, and that they are entitled to summary judgment on their FHA discrimination claim, based upon refusal to make a reasonable accommodation, because the undisputed material facts show that GIC unlawfully refused to grant their request for a reasonable accommodation. ECF No. 85-1 at 31-43. In addition, Plaintiffs request that the Court appoint a special master to conduct the "remedial stage" of finalizing an accommodation agreement, pursuant to Fed. R. Civ. P. 53. *Id.* at 44-45. And so, Plaintiffs request that the Court deny GIC's motion for summary judgment, and enter judgment summarily in their favor with regard to their FHA discrimination claim based upon refusal to make a reasonable accommodation. *Id.* at 58.

Plaintiffs have also filed a motion for leave to file a second amended complaint, which GIC opposes. ECF Nos. 64 and 73. In addition, GIC has filed motions to strike certain allegations contained in Plaintiffs' proposed second amended complaint and for leave to file a reply in support of its motion to strike. ECF No. 73 at 7-10; ECF No. 80.

For the reasons that follow, the Court: (1) **GRANTS** GIC's motion for summary judgment; (2) **DENIES** Plaintiffs' cross-motion for partial summary judgment; (3) **DENIES** Plaintiffs' motion for leave to file a second amended complaint; (4) **DENIES-as-MOOT** GIC's motion to strike certain allegations from the proposed second amended complaint; (5) **DENIES-**

**as-MOOT** GIC's motion to file a reply in support of its motion to strike; and (6) **DISMISSES** the amended complaint.

> ### A.    The Undisputed Material Facts Show That GIC Did Not Refuse To Grant Plaintiffs' Requests For An Accommodation

As an initial matter, the undisputed material facts in this case make clear that Plaintiffs cannot prevail on their refusal to make reasonable accommodations claim under Section 3604(f)(3)(B) of the FHA.  To prove a claim of disability discrimination under the FHA, based upon refusal to make a reasonable accommodation, Plaintiffs bear the burden of establishing that "the proposed accommodation is (1) reasonable and (2) necessary (3) to afford handicapped persons equal opportunity to use and enjoy housing."  *Scoggins*, 718 F.3d at 272; *see also Bryant Woods Inn*, 124 F.3d at 603–04 (citing 42 U.S.C. § 3604(f)(3)).  The Fourth Circuit has held that, whether an accommodation is reasonable is a fact-specific inquiry that considers: (1) the extent to which the accommodation would undermine the legitimate purposes and effects of existing zoning regulations; (2) the benefits that the accommodation would provide to the handicapped; and (3) whether alternatives exist to accomplish the benefits more efficiently.  *Bryant Woods Inn*, 124 F.3d at 604.

Relevant to this dispute, the Fourth Circuit has held that an accommodation is "necessary" under the FHA, if there is a "direct linkage between the proposed accommodation and the equal opportunity to be provided to the handicapped person."  *Id.* (internal quotation marks omitted).  As the Fourth Circuit has explained, the "necessary" element "has attributes of a causation requirement . . . [And so,] if the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be 'necessary.'"  *Id.*; *see also Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105-11 (3d Cir. 2018).  The Fourth Circuit has also recognized that equal opportunity for housing to be provided to handicapped persons does "not require accommodations that increase a benefit to a handicapped person above that provided to a non-handicapped person with respect to matters unrelated to the handicap." *Bryant Woods Inn*, 124 F.3d at 604.  And so, to prevail on their reasonable accommodation claim here, Plaintiffs must show, among other things, that the removal of the four conditions that they challenge in this case is necessary to provide their disabled residents with an equal opportunity to housing.

The undisputed material facts show that Plaintiffs cannot make such a showing.  In this action, Plaintiffs challenge four disputed conditions contained in the March 26, 2021, MOU, namely, the Guarantor Provision, the Dispute Resolution Provision, the Arbitration Escrow Provision and the Septic Provision.  ECF No. 65-2 at ¶¶ 103, 104; ECF No. 85-1 at 25-26.  But, as discussed below, Plaintiffs neither present evidence to show that removing these conditions is necessary for them to provide housing to disabled residents, nor that the inclusion of these conditions in the March 26, 2021, MOU constitute a "refusal" by GIC of their request for a reasonable accommodation under the FHA.

First, Plaintiffs do not present any evidence to show that removing the Guarantor Provision in the March 26, 2021, MOU is "necessary" to ensure that the future disabled residents of the Banbury Property have an equal opportunity to use and enjoy this dwelling.  Plaintiffs seek to remove the Guarantor Provision, which requires certain guarantees from all entities and individuals who would be associated with the Banbury Property and its operator, upon the ground that this provision is not a reasonable accommodation under the FHA.  ECF No. 85-1 at 33; *see* ECF No. 71-70 at 1, 2.  But, Plaintiffs fail to show that there is any "direct linkage" between removing this provision and the ability for disabled residents to use and enjoy the Banbury Property.  *See* ECF No. 85-1 at 33-38.

Indeed, it is undisputed that the Guarantor Provision does not address Plaintiffs' reasonable accommodation request, or the disability needs of the Banbury Property's potential disabled residents.  ECF No. 71-70 at 1, 2.  Plaintiffs also acknowledge that GIC included the Guarantor Provision in the March 26, 2021, MOU to protect GIC against Mr. Lussi initiating time-consuming and expensive litigation arising out of the Banbury Property.  ECF No. 85-1 at 33-38; ECF No. 97 at 14-15, 19-21; *see also* ECF No. 88 at 9, 18.  In addition, Plaintiffs have not identified any evidence to show that removing this condition would service the disability-related needs of their potential residents.  *See* ECF No. 85-1 at 33-38; ECF No. 97 at 14-15, 19-21.  Given this, Plaintiffs have not satisfied their burden to show that removing the Guarantor Provision in the March 26, 2021, MOU is "necessary" under the FHA.

Plaintiffs similarly fail to show that there is a "direct linkage" between removing the March 26, 2021, MOU's Dispute Resolution Provision and the ability of disabled residents to use and enjoy the Banbury Property.  The MOU's Dispute Resolution Provision requires a notice-

and-cure period of less than 60 days to resolve disputes promptly.  ECF No. 85-1 at 33; *see* ECF No. 71-70 at 1, 2.  But, again, the Dispute Resolution Provision does not address Plaintiffs' reasonable accommodation request, or the disability needs of the Banbury Property's disabled residents.  ECF No. 71-70 at 1, 2.  Plaintiffs also do not point to any evidence to demonstrate that removing this condition is essential to enable the Banbury Property's potential residents to live at the group home.  *Id.* at 33-38.  And so, Plaintiffs have also not satisfied their burden to show that removing the Dispute Resolution Provision of the March 26, 2021, MOU is "necessary" under the FHA.

While a closer issue, Plaintiffs' challenge to the so-called Septic Provision contained in Sections 7 and 9 of the March 26, 2021, MOU is also unpersuasive.  The Septic Provision provides, in relevant part, that:

> [P]rior to any on-site preparation of meals for its residents, ALWII shall provide to the Corporation (1) a certification of a competent hydrological engineering firm as to the adequacy of the septic system to accommodate the full residency and staffing of the Facility and (2) a plan to monitor and evaluate the current and future impacts of discharges from the Facility and property to the property of neighbors or the Corporation in the event that evidence of such discharges appears. ALWII further will be required, if discharges are observed, to implement the approved plan and take appropriate steps to eliminate the discharges in a timely manner, and to bear the full cost of remediation.
>
> [. . .]
>
> ALWII is required to provide Septic Certification to the Corporation annually . . . and to take necessary and appropriate remedial measures in the event that the system is not working properly or out of compliance with Federal, State, or local environmental regulations. Such Septic Certification shall be prepared by a competent environmental engineering firm, the cost of which will be borne by ALWII. Moreover, ALWII shall install a meter that creates daily monitoring reports measuring effluent at less than 900gpd flowing to the tank. Those reports shall be maintained and made available to the Corporation upon request. If the 900gpd flow rate is exceeded for more than three consecutive days, ALWII shall take steps to achieve a reduction in that rate and return the rate to compliance.

ECF No. 71-70 at 7-8.

The unrebutted evidence before the Court shows that there is no "direct linkage" between removing the Septic Provision and the ability of disabled residents to use and enjoy the proposed

group home.  Like the Guarantor Provision and the Dispute Resolution Provision, a careful reading of the Septic Provision makes clear that this provision does not address Plaintiffs' accommodation request, or the disability needs of the Banbury Property's potential residents. ECF No. 71-70 at 7-8.  Rather, the undisputed material facts show that the Septic Provision addresses GIC's environmental concerns about the increased occupancy of the property to accommodate nine full-time residents and the unique environmental issues associated with the Banbury Property.  *Id.*; *see also* ECF No. 71-71; ECF No. 71-1 at 24; ECF No. 88 at 9; ECF No. 107 at 5.

Notably, it is undisputed that, in 2007, the previous owners of the Banbury Property agreed with the Anne Arundel County Health Department that, among other things, the Banbury Property would be built with no more than five bedrooms; the living space or occupancy would not be expanded without further approval; and the owner would maintain a nonconventional sewage disposal system to prevent any malfunction or overflow and perform and necessary repairs.  ECF No. 71-1 at 24, 32; ECF No. 71-71 at ¶¶ 8,11(c).  It is also undisputed that Plaintiffs' renovation of the Banbury Property to convert the property into a group home increased the number of bedrooms from four to nine and the number of full bathrooms within the property from five to nine.  *See* ECF No. 71-17 at 3; ECF No. 71-30 at 12.  In addition, it is undisputed that the Septic Provision is designed to safeguard Gibson Island's environment, because the Banbury Property's nonconventional sewage disposal system is located in an area encircled by flood zones.  ECF No. 71-17 at 3; ECF No. 71-18 at 2.

Given these undisputed facts, Plaintiffs have not shown that removing the Septic Provision would be essential to enable the Banbury Property's potential disabled residents to live at the group home.  *See* ECF No. 85-1 at 33-38; ECF No. 97 at 14-23; ECF No. 104 at 17-23.

GIC also argues with persuasion that the undisputed material facts in this case show that the Septic Provision does not single out the Banbury Property's potential disabled residents because of their disability.  ECF No. 71-1 at 24; ECF No. 107 at 15-16.  GIC represents to the Court that it included the Septic Provision in the March 26, 2021, MOU, because GIC "was concerned that the increased occupancy could result in septic overflows that would be delivered into the Chesapeake Bay."  ECF No. 107 at 6.  In this regard, it is important to note that there is no dispute among the parties that the Septic Provision addresses all wastewater at the Banbury

Property, including wastewater from the kitchen, laundry, and showers. *Id.* at 15. Given this, the undisputed evidence shows that the inclusion of the Septic Provision in the March 26, 2021, MOU is unrelated to the disability status of the Banbury Property's potential disable residents.

The Court is also satisfied that the degree of monitoring required under the Septic Provision would not be onerous on the potential residents of the Banbury Property. Neither the Septic Certification, nor any of the other terms of the Septic Provision, require monitoring of the bodily functions of any of the residents of the Banbury Property, collectively or individually. *Id.* In addition, the certification requested under the Septic Provision is required just once a year and this certification is made by the owners of the Banbury Property, and not by the group home's residents. ECF No. 71-10 at 7-8.

Plaintiffs' argument that the Septic Provision denies the Banbury Property's potential disabled residents an equal opportunity to enjoy and use the Banbury Property, because this condition imposes additional costs, is also unavailing. ECF No. 104 at 20-21. Plaintiffs do not point to any evidence to show that the Banbury Property's future residents would bear the costs of the Septic Provision, or to show how these costs would prohibit the Banbury Property from operating as a group home. ECF No. 108 at 11-12. Without more, Plaintiffs merely speculate about the effect of this condition on the Banbury Property's financial viability, or ability to operate. *See Bryant Woods*, 124 F.3d at 604-05; *see also Schwarz*, 544 F.3d at 1226; ECF No. 95 at 4.

Plaintiffs also offer no evidence to show that removal of the Septic Provision is necessary to provide their disabled residents with the same therapeutic benefits that could be provided if the accommodation agreement did not include this condition. The Fourth Circuit has held that, "if the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be 'necessary.'" *Bryant Woods Inn*, 124 F.3d at 604. Given this, to satisfy the "necessary" prong of their reasonable accommodation claim, Plaintiffs must prove that their proposal would "ameliorate [the] *effect* of the handicap on the achievement of equal housing opportunity." *Vorchheimer*, 903 F.3d at 110 (citations omitted) (emphasis in original); *see Bryan Woods Inn*, 124 F.3d at 605 (finding that a group home operator failed to show that increasing the occupancy of his home from eight authorized residents to 15 was "necessary" because he

"presented no evidence . . . that expansion from 8 to 15 residents would be therapeutically meaningful.")

Again, Plaintiffs have not made this showing.  Plaintiffs argue that removing the Septic Provision is necessary, because "[b]eing singled out for monitoring of effluent is insulting and demoralizing to individuals who wish to live in a supportive group home setting."  ECF No. 104 at 22; *see also* ECF No. 97 at 21 ("extraordinary monitoring would be potentially demoralizing to residents, curtailing therapeutic benefits").  While the Court shares Plaintiffs' concern about singling out the Banbury Property's potential disabled residents, as discussed above, there is no evidence that this would occur here, because of the Septic Provision.  But, as discussed above, the unrebutted evidence makes clear that the Septic Provision does not involve the monitoring of the waste of the Banbury Property's disabled residents.  ECF No. 71-70 at 7-8.  There is also no evidence in the record to show that any potential residents of the Banbury Property would even be aware of the septic monitoring system required under the Septic Provision.[4]  ECF No. 107 at 16.  Given this, Plaintiffs have also not met their burden to show that removing the Septic Provision is necessary under the FHA.

Lastly, Plaintiffs also fail to show that removal of the Arbitration Escrow Provision set forth in Section 21 of the March 26, 2021, MOU is necessary.  This provision requires that any future claims with respect to Plaintiffs' reasonable accommodation be "subject to mandatory and binding arbitration," including a requirement that each side deposit $100,000 in escrow to cover any future award of attorneys' fees and damages.  ECF No. 71-70 at 5-6.

Plaintiffs do not dispute that GIC added the Arbitration Escrow Provision to disincentivize the parties from racing to costly arbitration, and to ensure the prevailing party would be made whole, but only if arbitration proceedings were initiated.  ECF No. 85-1 at 33-38; ECF No. 95 at 7.  Notably, this provision does not supplant the rights of the Banbury Property's potential disabled residents as a condition for receiving a reasonable accommodation.  *See id.*

---

[4] In addition, while Plaintiffs point to the expert testimony from Mark Davis, who has 40 years of experience working in the field of assisted living group homes, stating that he has never heard of a similar condition imposed upon a group home, his testimony does not show that it is necessary to remove the Septic Provision, so that the disabled residents have an equal opportunity to use and enjoy the Banbury Property.  *See* ECF No. 108-2, Davis Decl. at ¶ 3.

And so, Plaintiffs have also not satisfied their burden to show that removing the Arbitration Escrow Provision of the March 26, 2021, MOU is "necessary" under the FHA.

Because Plaintiffs fail to show that removal of any of the four disputed conditions in the March 26, 2021, MOU is necessary for their disabled resident to have an equal opportunity to use and enjoy the Banbury Property, they simply cannot satisfy the "necessary" element of their reasonable accommodation claim. *Bryant Woods Inn*, 124 F.3d at 604-05; *see also Harmony Haus Westlake, LLC v. Parkstone Property Owners' Ass'n, Inc.*, 851 F. App'x 461, 465 (5th Cir. 2021) (citing *Bryant Woods Inn*, 124 F.3d at 605) ("When assessing an FHA reasonable-accommodation request, necessity must be considered in the light of 'proposed alternatives.' . . . Merely being preferable to an alternative is not sufficient; it must be essential."); *Vorchheimer*, 903 F.3d at 112 (Plaintiff's requested accommodation of leaving her walker in the lobby of her building was not "necessary" because building had offered to have staff store and retrieve the walker on demand, bring the walker to plaintiff's car, or allow plaintiff to park and leave the walker in the building's valet garage). For this reason, the Court GRANTS GIC's motion for summary judgment and DENIES Plaintiffs' cross-motion for partial summary judgment on this claim. Fed. R. Civ. P. 56.[5]

### B. The Undisputed Material Facts Show That Plaintiffs Cannot Prevail On Their Intentional Discrimination And Disparate Treatment Claims

The undisputed material facts in this case also show that Plaintiffs cannot prevail on their claims that GIC discriminated against them by making unavailable or denying housing under Section 3604(f)(1) and (2) of the FHA.

To prove a claim of disability discrimination under Section 3604(f) of the FHA, Plaintiffs must furnish either direct evidence of discriminatory intent, which includes "conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested [housing] decision," or proceed under the *McDonnell Douglas* burden-shifting framework. *Letke*, 2013 WL 6207836, at *3 (citation omitted); *Martin*, 535 F. App'x at 244. Under the *McDonnell Douglas* framework, Plaintiffs must first establish a *prima facie* case of

---

[5] There is also no evidence in this case to show a "constructive denial" of Plaintiffs' requests, because Plaintiffs do not claim that the four disputed conditions in the March 26, 2021, MOU prevent them from operating the Banbury Property, or present an insurmountable burden. *See generally*, ECF No. 85-1.

discrimination. *McDonnnell Douglas Corp*, 411 U.S. at 802.  If Plaintiffs establish a *prima facie* case of discrimination, the burden shifts to the Defendants to articulate a legitimate, nondiscriminatory reason for engaging in the action.  *See Martin*, 535 F. App'x at 245.

"If the Defendants produce a legitimate reason for the action, the burden once again shifts to [Plaintiffs] to show that the Defendants' rationale is pretext for discrimination." *Id.*  Plaintiffs "can prove pretext by showing that the [Defendants'] explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of . . . discrimination." *Id.* (citation omitted).

The undisputed material facts show that Plaintiffs cannot prevail on their intentional discrimination claims under the FHA, because there is no evidence before the Court to show that GIC intentionally discriminated against Plaintiffs, or their potential disabled residents, upon the basis of disability.[6]

To support their discrimination claims, Plaintiffs point to certain emails and statements made by GIC's former President, James Daly.  *See* ECF No. 85-1 at 48 (citing ECF No. 85-25).  But, it is undisputed that Mr. Daly was no longer part of GIC's Board when negotiations began with Plaintiffs to establish the group home in 2021.  ECF No. 88-3, Daly Dep. at 27:6-13.  Given this, Plaintiffs have not shown that the statements or emails have any connection to the alleged denial of their reasonable accommodation request.  More importantly, Mr. Daly's statements do not reference the disabilities of the Banbury Property's potential residents.  *See* ECF No. 85-15 at 247-48, 273-77.  Given this, the statements simply do not demonstrate that discriminatory animus was a motivating factor in GIC's response to Plaintiffs' request for a reasonable accommodation.

Plaintiffs also cannot prevail on their claim for discrimination in the terms, conditions, or privileges of sale or rental of the Banbury Property under Section 3604(f)(2) of the FHA,

---

[6] Plaintiffs rely upon two emails from GIC's former President, James Daly, sent on March 26, 2020, and April 10, 2020.  *See* ECF No. 85-1 at 48; ECF No. 85-25.  Mr. Daly states in the emails that GIC will "do [its] best to defend deed and agreements v FHA" and that it is "taking a 360 degree look at how to block CL, even if the group home is 'by right' consistent with FHA."  *See* ECF No. 85-25.  Plaintiffs also point to Mr. Daly's deposition testimony and argue that he "admitted to suggesting to the Accommodations Committee that GIC take the position that the Lussis themselves were an undue burden."  ECF No. 85-1 at 48 (citing ECF No. 85-15 at 247-48, 273-77).

because there is no evidence before the Court to show that GIC took any actions related to the sale, or rental of the Banbury Property.  To prove a claim under Section 3604(f)(2), Plaintiffs must prove that they were subjected to terms, conditions, or privileges, in the sale or rental of the Banbury Property, or provided services or facilities in connection with the Banbury Property, different from nondisabled residents of Gibson Island, because of disability.  *See Roberson*, 2010 WL 2106466, at \*2.  It is undisputed in this case that the sale of the Banbury Property to Plaintiffs occurred on March 4, 2020, one year *before* GIC issued the March 26, 2021, MOU. *See* ECF No. 65-2 at ¶¶ 24, 25; *see* ECF No. 71-25.  It is also undisputed that the Banbury Property has not yet been rented.  *Id*.  A careful reading of the March 26, 2021, MOU also makes clear that the MOU does not contemplate that GIC will provide any services or facilities in connection with the Banbury Property.  ECF No. 71-1 at 31.  Given this, Plaintiffs cannot prevail on their discrimination claim based upon Section 3604(f)(2) of the FHA.  And so, the Court also GRANTS GIC's motion for summary judgment on this claim.

Plaintiffs' disparate impact and disparate treatment claims must also fail, because they fail to show that GIC had either a discriminatory intent or motive when it responded to their reasonable accommodation request.  As discussed above, Plaintiffs have not presented any evidence of discriminatory animus related to their request for a reasonable accommodation.[7] Without doing so, Plaintiffs cannot prevail on their disparate impact and disparate treatment claims.  And so, the Court also GRANTS GIC's motion for summary judgment on these claims. Fed. R Civ. P. 56.

### C.    Plaintiffs Cannot Prevail On Their FHA Retaliation Claims

Plaintiffs' FHA retaliation claims are also problematic.  Plaintiffs allege in this action that "GIC has retaliated against Plaintiffs' principals" for their "continued efforts to secure the rights of seniors with disabilities to live in a home of their choice on Gibson Island, including but not limited to a false light portrayal of [Mr. Lussi]."  ECF No. 47 at ¶ 12.  Plaintiffs also allege that "GIC retaliated against the Lussis for seeking to open a five (5) bedroom assisted living group home" by: (1) "publish[ing] a knowingly false Board Resolution on November 23, 2019;" (2)

---

[7] This Court previously held that there was no evidence in the record to show that GIC's efforts to enforce the Restrictive Covenants with regards to the Banbury Property discriminated against Plaintiffs based upon the disability of the potential residents of the property.  No. 1:20-cv-842-RDB, ECF No. 30 at 14-18.

engaging in "numerous acts of personal retaliation against Mr. Lussi, Mrs. Lussi, and their children;" and (3) threatening Mrs. Lussi with expulsion from the Club.  *See id.* at ¶¶ 33 and 157.

As GIC correctly observes in its cross-motion, to the extent that Plaintiffs seek to assert FHA retaliation claims based upon alleged retaliation against the Lussis, they lack standing to do so because the Lussis are not parties to this case.

A careful reading of the amended complaint also makes clear that Plaintiffs cannot show that they suffered any adverse action to support their retaliation claims.  In this regard, Plaintiffs contend that GIC took adverse actions against them by: (1) defaming the Lussis; (2) "sending 'anonymous' harassing letters;" (3) "seeking to have GHGI's permits revoked;" (4) "threatening to install a large net blocking Banbury House's view;" (5) "delaying the process to increase costs;" and (6) "tearing up the gravel that formed the best access for emergency vehicles" to the Banbury Property.  ECF No. 85-1 at 57.  To prove their claims for retaliation under the FHA, Plaintiffs must show, among other things, that GIC "took adverse action against [them]" and "that a causal connection existed between the protected activity and the asserted adverse action." *Hall*, 637 F. App'x at 98.  Plaintiffs make no such showing here for several reasons.

First, Plaintiffs fail to provide evidence to show that they suffered an adverse action under the FHA.  *See generally*, ECF No. 47.  While Plaintiffs argue that GIC retaliated against them by sending anonymous harassing letters and threatening to block their view from Banbury House with a large net, they point to no evidence to support these allegations.  ECF No. 85-1 at 57.  This Court has also previously held that GIC's decision to question Plaintiffs' permits for the Banbury Property was legitimately aimed at securing Mr. Lussi's compliance with the Deed Covenants.  *See* No. 1:20-cv-842-RDB, ECF No. 30 at 6842 ECF No. 30 at 13-18.

The delay that Plaintiffs allege GIC caused regarding the opening of the Banbury Property is also not an adverse action under the FHA.  *See Hall v. Greystar Mgmt. Servs., L.P.*, 28 F. Supp. 3d 490, 495 (D. Md. 2014) (Adverse action is an action that would "well dissuad[e] a reasonable [person] from making a charge of discrimination under the FHA."); *Clark v. 100 Harborview Drive Council of Unit Owners*, No. 14-cv-3122, 2016 WL 1159198, at *10 (D. Md. Mar. 23, 2016) (quoting *Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009) (internal quotation marks omitted) ("Interference is more than a quarrel among neighbors or an isolated act of discrimination but rather is a pattern of harassment, invidiously motivated.").  Indeed,

while it is clear from the evidence that there is some animosity between Plaintiffs and GIC, the evidence simply does not show that the delay in opening Plaintiffs' group home is due to retaliation for Plaintiffs having engaged in any FHA-protected activity.

The unrebutted evidence in this case also fails to support Plaintiffs' claim that GIC undertook an adverse action against them by tearing up the gravel on the road located near the Banbury Property.  ECF No. 85-1 at 57.  Plaintiffs acknowledge that GIC owns the road in question and that the sodding of that road did not prohibit, or limit, their ability to use the road in the same way that it has historically been used to access the Banbury Property.  *See* ECF No. 88 at 23-24; ECF No. 97.

Lastly, Plaintiffs fails to establish any causal connection between the alleged defamation of Mr. Lussi and their FHA protected activity.  It is undisputed that the alleged defamation of Mr. Lussi occurred in November 2019, many months *before* Plaintiffs requested a reasonable accommodation to open a group home at the Banbury Property in June 2020.  ECF No. 47 at ¶ 33; ECF No. 85 at 56-57.  Given this, Plaintiffs simply cannot show that this alleged adverse action is connected to their request for a reasonable accommodation.

For each of these reasons, the Court GRANTS GIC's motion for summary judgment on Plaintiffs' FHA retaliation claims.[8]  Fed. R. Civ. P. 56.

### D.    Leave To Further Amend The Complaint Is Unwarranted

As a final matter, Plaintiffs have not shown that further amendment of the complaint is warranted at the advanced stage of this litigation.  Pursuant to Fed. R. Civ. P. 15(a)(2), Plaintiffs may further amend the complaint in this case only with the opposing party's written consent, or the Court's leave.  Fed. R. Civ. P. 15(a)(2).  The decision of whether to grant or deny leave to amend is within the discretion of the Court, and the Court "should freely" grant leave to amend "when justice so requires."  *Id.*; *see also Foman*, 371 U.S. at 182; *Simmons v. United Mortg. &*

---

[8] The Court also declines to appoint a special master to help the parties reach an accommodation agreement.  Fed. R. Civ. P. 53 authorizes the Court to appoint a Special Master.  ECF No. 85-1 at 44-45. But where, as is the case here, the Court is fully capable of timely addressing any pre-trial issues in the case and there are no exceptional circumstances in the case, a special master is not needed.  *See* Fed. R. Civ. P. 53 (a)(1)(B).

*Loan Inv., LLC*, 634 F.3d 754, 769 (4th Cir. 2011).  But, the Court may deny a party leave to amend for reasons "'such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed undue prejudice to the opposing party by virtue of allowance of the amendment or futility of the amendment.'"  *Booth v. Maryland*, 337 F. App'x 301, 312 (4th Cir. 2009) (per curiam) (quoting *Foman*, 371 U.S. at 182).

In this regard, the Fourth Circuit has explained that "[w]hether an amendment is prejudicial will often be determined by the nature of the amendment and its timing . . . [T]he further the case progressed before judgment was entered, the more likely it is that the amendment will prejudice the defendant[.]'"  *Newport News Holdings Corp.*, 650 F.3d at 439 (quoting *Laber*, 438 F.3d at 427).  To be sure, "prejudice can result where a proposed amendment raises a new legal theory that would require the gathering and analysis of facts not already considered by the opposing party, but that basis for a finding of prejudice essentially applies where the amendment is offered shortly before or during trial."  *Johnson*, 785 F.2d at 510.  In contrast, generally "[a]n amendment is not prejudicial . . . if it merely adds an additional theory of recovery to the facts *already pled* and is offered before any discovery has occurred."  *Laber*, 438 F.3d at 427 (emphasis added).

In this case, Plaintiffs seek to further amend the complaint to add new factual allegations regarding their March 2022 request for a reasonable accommodation and to otherwise support their FHA retaliation claims.  ECF No. 64 at ¶ 3.  Plaintiffs state that they are seeking leave to amend at this time, because certain facts have come to light during discovery, and after the close of discovery, in this case.  *See id.* at ¶¶ 3-4.

The Court shares GIC's concerns that the proposed amendments would prejudice GIC and unnecessarily delay the resolution of this litigation.  Plaintiffs propose these amendments more than one year after discovery closed in this case on June 30, 2022.  ECF No. 38.  Plaintiffs also waited almost two years after the June 30, 2021, deadline for amendments to the pleadings under the Court's Scheduling Order to seek the proposed amendments.  *Id.*

The Court also observes that the parties have now completed their summary judgment briefing in this case.  While Plaintiffs generally state they discovered new facts during and after the close of discovery, Plaintiffs provide no explanation for the delay in seeking these proposed

amendments.  ECF No. 64 at 3; ECF No. 77.  And so, Plaintiffs have not shown that good cause exists to allow further amendment of the complaint.[9]  Fed. R. Civ. P. 16.

**VII.    CONCLUSION**

In sum, the undisputed material facts in this matter show that Plaintiffs cannot prevail on their FHA discrimination claims and related state law claims.  The undisputed material facts also show that Plaintiffs cannot establish that GIC retaliated against Plaintiffs in violation of the FHA.  Lastly, Plaintiffs have not shown that good cause exists to allow further amendment of the amended complaint.

And so, for the foregoing reasons, the Court:

1. **GRANTS** GIC's motion for summary judgment;
2. **DENIES** Plaintiffs' cross-motion for partial summary judgment;
3. **DENIES** Plaintiffs' motion for leave to file a second amended complaint;
4. **DENIES-as-MOOT** GIC's alternative motion to strike allegations from the proposed second amended complaint;
5. **DENIES-as-MOOT** GIC's motion to file a reply in support of its alternative motion to strike allegations from the proposed second amended complaint; and
6. **DISMISSES** the amended complaint.

A separate Order shall issue.

s/Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge

---

[9] Plaintiffs' proposed amendments also appear to be futile, because the proposed amendments would not address the deficiencies identified by the Court with regards to Plaintiffs' FHA discrimination and retaliation claims.